432 A.2d 206

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Larry SELL.**

Superior Court of Pennsylvania.

Argued June 9, 1980.

Filed March 6, 1981.

Reargument Denied Aug. 6, 1981.

Petition of Allowance of Appeal Granted Oct. 9, 1981.

it is the offense upon which the sentence should be imposed in the instant case.

372

Robert Lee Steinberg, Assistant District Attorney, Allentown, for Commonwealth, appellant.

C. Steven Miller, Allentown, for appellee.

Before PRICE, WICKERSHAM and LIPEZ, JJ.

PRICE, Judge:

The Commonwealth appeals from the order of the Court of Common Pleas of Lehigh County granting appellee's motion to suppress certain items seized in a search conducted pursuant to an improperly issued search warrant. The sole issue presented in this appeal is whether appellee had stand-

ing to challenge the illegal search.[1] For the reasons stated herein, we conclude that appellee lacked the requisite standing and, therefore, reverse the order of the court below and remand for trial.

The following facts were adduced at the suppression hearing. On the morning of December 11, 1978, pursuant to a search warrant issued earlier that day, Detective John Young and other officers of the Allentown Police Department conducted a search of the premises known as Games Galore, an amusement arcade located at 110 North Sixth Street, City of Allentown, Lehigh County. The items enumerated in the warrant included various firearms stolen in a recent burglary. Games Galore is an amusement center providing pinball machines, computer games, pool tables and other sundry diversions for its patrons. The enterprise occupies the first floor of the building at 110 North Sixth Street and the second and third floors contain apartments rented by the owner of the building, one Joseph Clark. Mr. Clark is also the owner of Games Galore.

Much of the testimony at the suppression hearing concerned appellee's role in Games Galore. Mr. Clark testified that prior to the opening of the business in August of 1978, he had employed appellee as a serviceman to do general maintenance and repair work on the apartments. Appellee subsequently assisted Mr. Clark in renovating the first floor in preparation for the opening of the business,[2] and the two men then entered into a business arrangement whereby appellee would be a "working partner" and would receive half of the net profits from Games Galore so long as Mr.

1. The suppression court concluded that the search warrant was improperly issued because the accompanying affidavit of probable cause failed to allege facts to support the affiant's belief that his informant was credible and his information reliable. On appeal, the Commonwealth concedes that the search warrant was defective. Brief for Appellant at 10. Thus, we need only consider the issue of appellee's standing.

2. It appears that appellee did most, if not all, of the physical labor involved in renovating the premises, while Mr. Clark contributed the capital necessary to purchase building materials and equipment for the arcade.

Clark "saw to it that way." N.T. Suppression Hearing 9. As a "working partner," appellee was responsible for the actual daily operation of the business. Mr. Clark, however, kept the business' records, hired and discharged employees, and authorized all financial transactions. Furthermore, Mr. Clark testified that he had the authority to discharge appellee and reiterated that appellee was to receive fifty percent of the profits only so long as he continued working at Games Galore.

Appellee testified that as daily manager of the business he had authority to hire and discharge employees and to collect the daily receipts, which were then divided with Mr. Clark. Appellee also had keys to the building and unlimited access to the business premises. As manager, appellee was primarily responsible for the security of the establishment and, accordingly, had authority to exclude or remove individuals in the event of mischief or destruction of property on the premises. He did not, however, have keys to any of the game machines nor did he contribute any capital toward the establishment of Games Galore or its subsequent operation. Finally, he admitted on cross-examination that Mr. Clark was the owner of Games Galore.[3]

On December 11, 1978, appellee opened Games Galore for business at approximately 10:00 a. m., but he was not on the premises during the subsequent search. Appellee testified that he was across the street when Detective Young and the other officers arrived. Upon their arrival, the officers identified themselves and their purpose to the individuals present and proceeded to search the premises.[4] The search uncovered, *inter alia*, two firearms: a German Luger pistol

---

**3.** Appellee attempted to explain this statement on redirect examination. When asked what he meant when he stated that Mr. Clark owned Games Galore, appellee replied "he owned the whole building." N.T. Suppression Hearing 47.

**4.** Two persons, a Theresa Fenstermacher and one Dale Oswald, were inside Games Galore at the time of the search. Ms. Fenstermacher, appellee's girlfriend, was a Games Galore employee. Oswald's status relative to the business is unclear from the record. Both were arrested following the discovery of the stolen firearms.

and a Colt .45 caliber commemorative pistol. Detective Young testified that the two guns were found on a shelf underneath a counter used by the Games Galore employees to make change for the game machines and to store equipment for the pool tables. The business' cash register was located on the shelf beneath the counter, and appellee testified that he had in the past and on the day of the search kept several personal items on the shelf, including a radio, a wall clock and his jacket. The individuals present were placed under arrest and were subsequently questioned.

On December 12, 1978, appellee was arrested and charged with receiving stolen property[5] and criminal conspiracy.[6] The basis for the charges was the discovery of the firearms during the search and statements made to the police by Dale Oswald, one of the persons arrested at Games Galore following the search. Appellee subsequently filed a motion to suppress on March 14, 1979, challenging the validity of the search warrant and seeking to exclude all evidence obtained as a result of the search. A hearing on the motion was held on August 10, 1979, and on September 25, 1979, the order was issued granting the motion.[7] This appeal followed.

The suppression court concluded that appellee was entitled to claim so-called "automatic" standing to challenge the validity of the search warrant because an essential element of the crime of receiving stolen property is possession of the seized evidence at the time of the contested search and seizure. *See Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Commonwealth v. Treftz*, 465 Pa. 614, 351 A.2d 265 (1976), *cert. denied*, 426 U.S. 940, 96 S.Ct. 2658, 49 L.Ed.2d 392 (1976); *Commonwealth v. Mader*, 253 Pa.Super. 58, 384 A.2d 974 (1978). The doctrine of "automatic" standing was first enunciated by the United

5. 18 Pa.C.S. § 3925.

6. 18 Pa.C.S. § 903.

7. On September 27, 1979, an amended order was entered still granting appellee's suppression motion but also directing that the record of the proceedings as well as the order and accompanying opinion be impounded.

States Supreme Court in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The Court there recognized that such a rule was necessary to avoid the dilemma confronting an accused charged with a possessory offense since, to establish standing at a suppression hearing, a defendant would often be "forced to allege facts the proof of which would tend, if indeed not be sufficient, to convict him." *Id.* at 262, 80 S.Ct. at 731. Prior to *Jones,* an accused charged with a possessory crime might only be able to establish standing to challenge a search and seizure by giving self-incriminating testimony at the suppression hearing, which testimony would be admissible at trial as substantive evidence of guilt. A defendant was thus "obliged either to give up what he believed . . . to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968). Accordingly, to resolve the "self-incrimination dilemma," *Brown v. United States*, 411 U.S. at 228, 93 S.Ct. at 1568, the Supreme Court adopted the rule of "automatic" standing.

Recently, however the Supreme Court concluded that the "automatic" standing rule was no longer viable. In *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the Court held that defendants charged with possessory offenses may claim the benefits of the exclusionary rule only if their own fourth amendment rights have been violated and, accordingly, expressly overruled the "automatic" standing rule fashioned in *Jones v. United States, supra.*[8]

**8.** Mr. Justice Rehnquist, writing for the majority in *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), observed that the "self-incrimination dilemma," identified in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) as the principal rationale for the "automatic" standing rule, no longer existed following the decision in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *Simmons,* the Court held that when an accused testifies in support of a motion to suppress evidence on fourth amendment grounds, his testimony may not later be admitted against him at trial as substantive evidence of his guilt. Because the chief reason for the rule evaporated with the

Thus, the rule upon which the suppression court premised its conclusion that appellee had standing in the instant case is no longer valid. Consequently, we must determine whether appellee's own fourth amendment rights have been transgressed in order to judge whether he had "actual" standing to challenge the validity of the search warrant.[9]

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the United States Supreme Court recognized the now familiar principle that

> the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [citations omitted]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351–52, 88 S.Ct. at 511–12. Thus, the Supreme Court has consistently held that whether an individual is entitled to the protection of the fourth amendment "depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), *reh. denied*, 439 U.S. 1122, 99 S.Ct. 1035,

holding in *Simmons*, Justice Rehnquist concluded that the "automatic standing rule of *Jones* has outlived its usefulness in this Court's Fourth Amendment jurisprudence. The doctrine now serves only to afford a windfall to defendants whose Fourth Amendment rights have *not* been violated." *United States v. Salvucci*, 448 U.S. at 95, 100 S.Ct. at 2554 (emphasis in original).

9. In *United States v. Salvucci, supra*, the Supreme Court remanded the case to give the defendants, who had relied solely upon "automatic" standing, an opportunity to demonstrate that their own fourth amendment rights had been violated. We find it unnecessary to remand for such a determination in the case *sub judice* because much of the testimony at the suppression hearing concerned appellee's "actual" standing. Because it concluded that appellee had "automatic" standing, however, the suppression court found it unnecessary to resolve the issue of appellee's "actual" standing.

59 L.Ed.2d 83 (1979).[10]  *See, e. g., Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *GM Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *Mancusi v. Deforte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The controlling consideration, therefore, is whether the individual contesting the search and seizure entertains a legitimate expectation of privacy in the premises or area searched. *See Commonwealth v. Dobson,* 486 Pa. 299, 317–18, 405 A.2d 910, 920 (1979) (Manderino, J., dissenting).

> This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," 389 U.S. at 361, 88 S.Ct. 507, [at p. 516], 19 L.Ed.2d 576—whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." *Id.* at 351, 88 S.Ct. 507, [at p. 511], 19 L.Ed.2d 576. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" *id.,* at 361, 88 S.Ct. 507, [at p. 516], 19 L.Ed.2d 576—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.,* at 353, 88 S.Ct. 507, [at p. 512], 19 L.Ed.2d 576.

*Smith v. Maryland,* 442 U.S. at 740, 99 S.Ct. at 2580 (footnote and citations omitted).

**10.** In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court questioned whether it served any useful analytical purpose to consider the issue of standing as distinct from the merits of an accused's fourth amendment claim. Concluding that it did not, the Court merged the issue of standing into the substantive issue of "whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained." *Id.* at 140, 99 S.Ct. at 428. More particularly, that issue turns on "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.*

■ Moreover, in deciding the legitimacy of an accused's asserted privacy expectation, no single factor is determinative. *Rakas v. Illinois*, 439 U.S. at 152, 99 S.Ct. at 435. (Powell, J., concurring). "Obviously, however a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered.... Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* at 143 n.12, 99 S.Ct. at 430 n.12. Thus, the Supreme Court has considered whether the individual claiming the protection of the fourth amendment took ordinary precautions to insure his privacy, *see, e. g., United States v. Chadwick, supra; Mancusi v. DeForte, supra; Katz v. United States, supra,* and has examined the manner in which an individual has used a particular location, *see Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Jones v. United States, supra.* Finally, as the Court recognized in *Rakas*, principles of property law reflect society's express recognition of an individual's authority to conduct himself as he desires in certain areas and, while not controlling, "should be considered in determining whether an individual's expectations of privacy are reasonable." *Rakas v. Illinois*, 439 U.S. at 153, 99 S.Ct. at 435. (Powell, J., concurring).

■ Appellee first argues that he had a legitimate expectation of privacy in the Games Galore premises because he had a proprietary interest in the amusement arcade, as evidenced by his fifty percent share of the business' net profits. While it is true that Joseph Clark considered appellee as a "working partner" and that appellee received fifty percent of the profits in return for his services as daily manager of Games Galore, it is also true that appellee was entitled to share in the profits only while he continued to work. Furthermore, other evidence adduced at the suppression hearing leads us to the conclusion that the relationship between Mr. Clark and appellee was more in the nature of employer and employee than as partners. Specifically,

Clark, not appellee, owned the building housing the arcade. Clark had total control over all financial aspects of the operation, including keeping the books and authorizing all expenditures. Most importantly, Clark testified that he had the authority to discharge appellee and that appellee would receive a share of the profits only as long as he, Clark, "saw to it that way" and as long as "everything ran as we anticipated." N.T. Suppression Hearing 9–10. In light of this evidence, it is clear that appellee's status at the time of the search was that of Games Galore employee and, accordingly, he had no possessory or proprietary interest fostering a legitimate expectation of privacy in the premises.

■ Appellee also argues that the shelf beneath the counter was an area where, even as an employee, he enjoyed a reasonable expectation of freedom from governmental intrusion. We disagree. The counter area where the two pistols were discovered was used by all Games Galore employees to distribute game equipment and to make change for patrons. Indeed, all employees had to have access to the shelf because the arcade's cash register was kept there. Moreover, the shelf itself was not a private work area designated for any single employee. Rather, it was used generally as a place of storage, not only for the personal effects of employees but also for pool cues and other equipment. *Cf. Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (records kept in office shared by defendant and other union officers); *Gillard v. Schmidt*, 579 F.2d 825 (3d Cir. 1978) (school guidance counselor had reasonable expectation of privacy in his desk).

Furthermore, the firearms were not concealed but were discovered resting openly on the shelf. There was no evidence that they had ever been secreted in a drawer or placed under lock and key, nor does it appear that appellee took any other ordinary precautions to insure his privacy expectation. *Cf. United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (defendants who placed personal effects inside a double-locked footlocker manifested an expectation that contents would remain free from intrusion); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (defendant

who entered telephone booth, shut door behind him, and paid to make call entitled to assume his conversation would be private); *United States v. Speights,* 557 F.2d 362 (3d Cir. 1977) (police officer's locker secured by personal lock protected by fourth amendment); *Commonwealth v. Gabrielle,* 269 Pa.Super. 338, 409 A.2d 1173 (1979) (private employee who regularly secured his locker at work with personal lock had reasonable expectation of freedom from intrusion). Finally, appellee was absent from the premises during the search. His conduct in leaving Games Galore without either removing the stolen firearms or taking ordinary measures to protect his privacy expectation in them hardly manifests a legitimate expectation of privacy.

In light of the facts in the instant case, we hold that appellee did not entertain a reasonable expectation of privacy in either the premises searched, Games Galore, or in the specific area where the stolen firearms were discovered. Consequently, he does not have an interest protected by the fourth amendment and may not, therefore, challenge the validity of the search warrant.

Accordingly, we reverse the order of the court of common pleas and remand the case for trial.