493 A.2d 1365

**COMMONWEALTH of Pennsylvania**

v.

**Ricky D. PINKINS, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 19, 1984.

Filed April 19, 1985.

Reargument Denied July 1, 1985.

46

David J. Graban, Sharon, for appellant.

Charles S. Hersh, Assistant District Attorney, Hermitage, for Commonwealth, appellee.

Before ROWLEY, OLSZEWSKI and POPOVICH, JJ.

OLSZEWSKI, Judge:

Appellant challenges his conviction for murder of the second degree, robbery and criminal conspiracy. For the reasons below, we reverse his conviction and remand for a new trial.

Appellant was one of six individuals charged with murder, robbery and conspiracy following the armed robbery of the owner and patrons of Porreca's Restaurant & Bar. The other men were Henry ("Henny Penny") Bruce, who pleaded guilty to second degree murder, robbery and conspiracy; Eugene Grannison, convicted by a jury of the same; Albert Phillips, who pleaded guilty to third degree murder, robbery and conspiracy; Albert Boatwright, who pleaded guilty to third degree murder; and Anthony Wells, acquitted by a jury of all charges.

On January 9, 1982, at approximately 9:30 p.m., three young men entered Porreca's Restaurant; Wells held a shotgun, Bruce a revolver, and Boatwright acted as bagman. Phillips and Grannison remained outside in the getaway vehicle. In the course of the robbery, one man was beaten and another killed.

Appellant was not among the five robbers that night. He did, however, supply at least one of their weapons. Commonwealth proceeded on the theory that Wells, Boatwright, Phillips, Grannison, and Bruce, had agreed at the Colony Bar to rob a place to get some money. Wells called appellant and explained he needed a "piece" to get some money. The five men drove to appellant's house. Wells entered and returned with a loaded .32 caliber revolver and, possibly, a shotgun. The men continued to Porreca's Res-

taurant. When Wells split the proceeds of the robbery, he set aside a share for appellant.

Informants implicated appellant in the Porreca murder/robbery. Pursuant to that information, the police devised a scheme by which appellant was lured from the house and appellant's mother was induced to search for the gun. When confronted with the gun, appellant confessed that he had supplied the weapon to Wells. He denied further involvement with the crime.

Charged with murder, robbery, and conspiracy, appellant filed a timely pre-trial motion to suppress, *inter alia,* use of the gun and his own statement. The suppression court denied that motion. The court also rejected a motion in limine to exclude from appellant's trial statements of Tony Wells, who had been acquitted of all charges.

Bruce and Boatwright testified at appellant's trial. Wells did not appear; his statements were, however, introduced against appellant. A jury returned a verdict of guilty on all counts.

Appellant first argues that the Commonwealth violated his Sixth Amendment rights by introducing against him the out-of-court statements of Tony Wells. The statements offered under the co-conspirators exceptions were: (1) Wells' assertion, before he led the others to appellant's house, that he knew where to get some guns and (2) his declaration, while dividing the money from the robbery, that he was holding a share for appellant. Appellant argues that Wells' prior acquittal on all charges bars admission of these statements under the co-conspirator's exception. Then, assuming *arguendo,* the propriety of their admission under that standard, he contends that use of Wells's statements, where Wells did not appear in court and the Commonwealth had failed to establish Wells's unavailability, violated his (appellant's) rights under the Confrontation Clause of the Sixth Amendment.

It is well-settled that statements of a conspirator made during the course of a conspiracy, in furtherance of

that conspiracy, are admissible against a co-conspirator if independent evidence establishes the existence of a conspiracy and the membership of the defendant and declarant therein. *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981). The courts employ a fiction that the conspirators, acting in concert, act as one; the statements of one conspirator so become the admissions of another. Wells' acquittal of all charges does not bar admission of his statements under the co-conspirator's exception. *See, e.g., United States v. Cravero*, 545 F.2d 406 (5th Cir.1976). Acquittal on a charge of criminal conspiracy means simply that Commonwealth has failed to prove beyond a reasonable doubt all elements of the offense. 18 Pa.C.S. Sec. 903. A lesser showing of proof is required when Commonwealth seeks to introduce evidence under the co-conspirator's exception. Commonwealth need only establish the conspiracy by a fair preponderance of the evidence independent of the challenged testimony. *Commonwealth v. Hirsch*, 225 Pa. Super. 494, 311 A.2d 679 (1973).

■ Wells' statements made to his cohorts concerned the procurement of weapons for and the divisions of proceeds from the illicit venture. The statements themselves could fairly give rise to an inference of conspiracy. It would follow that the statements were made in the course of, and in furtherance of the conspiracy. They were not, however, made in appellant's presence. A question remains as to whether the Commonwealth did establish by independent evidence appellant's membership in the conspiracy.

At trial, the five patrons present during the robbery testified. None knew appellant; none could place him at Porreca's that night. A sixth witness, James Pruitt, testified that sometime before the robbery, he had seen Wells, Grannison, Bruce, Phillips and Boatwright sitting talking in the Colony Restaurant, another neighborhood bar. The only conversation Pruitt heard was Wells talking about women. Albert C. Lowe took the stand and corroborated Pruitt's testimony.

Frank T. White, a Sharon policeman, stated that following the burglary, he had confronted appellant with a .32 caliber pistol. Appellant responded with a statement. When faced with that statement and the fact that the gun had been recovered, Boatwright admitted his involvement in the Porreca robbery/slaying. White's partner, Edward Tomko introduced a map purporting to show that Wells, Grannison, Boatwright, Bruce and Phillips all lived in the same general vicinity. On cross-examination, Tomko explained how he had used appellant's statement to confront Boatwright. That testimony reflected what Tomko told Boatwright appellant had said, not what appellant had actually said. Tomko, working from appellant's statement, stated that Tony Wells had come to appellant's house that night to borrow a gun. Wells had told appellant that he wanted some money. When the five arrived at appellant's home, appellant said that he went outside and saw Boatwright in the car. He did not talk to him. Albert C. Lowe took the stand and corroborated Pruitt's testimony.

Although there may be sufficient evidence to permit a reasonable inference of appellant's complicity in the enterprise, admission of the hearsay statements constitutes serious and therefore reversible error because it deprived appellant of his Sixth Amendment right to confrontation. The Commonwealth failed either to produce Tony Wells at trial or to adduce reasons for his unavailability. Because the independent evidence upon which the Commonwealth relied for introduction of the out-of-court statements was so tenuous, it was highly important that any out-of-court statements be unequivocal and that the declarant be subject to searching cross-examination. *See Commonwealth v. Graves,* 316 Pa.Super. 484, 463 A.2d 467 (1983) (distinguishing accomplice and co-conspirator).

In *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Supreme Court recognized that the confrontation clause and the hearsay rule "stem from the same roots," but stated that "the Court has never equated the two, and we decline to do so...." *Id.* at 86, 91 S.Ct. at

218. The confrontation clause issue and the evidentiary question therefore must be separately analyzed, and the sixth amendment may require exclusion of the evidence even though admissible under the co-conspirator's exception. *See United States v. Gibbs*, 739 F.2d 838, 852 (3rd Cir.1984) (Rosenn, J., dissenting).

In *Ohio v. Roberts*, 448 U.S: 56, 65–66, 100 S.Ct. 2531, 2538–2539, 65 L.Ed.2d 597 (1980), the Supreme Court identified two restrictions that the confrontation clause places on the use of hearsay evidence in criminal trials. First, the prosecution generally must establish that the hearsay evidence is necessary because the declarant is unavailable. Second, the hearsay statement must be reliable. "Reflecting its underlying purpose *to* augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.' " *Id.* at 64, 100 S.Ct. at 2538 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)). In the instant case, the necessity aspect of this test has not been met. Wells did not testify; Commonwealth failed to establish his "unavailability." Therefore, there is no need to reach the question whether the reliability prong has been satisfied.

Although the literal language of the sixth amendment guarantees to any accused "the right . . . to be confronted with the witnesses against him," the Supreme Court has recognized that the need to use extrajudicial statements may arise because of the declarant's unavailability. Appellant maintains that Wells was not legally unavailable to testify and that therefore there was not need to for introduction of his out-of-court statements. The Commonwealth contends that a showing of unavailability is not required. Further, it argues that appellant had a chance to subpoena Wells but chose not to do so.

■ The Supreme Court discussed the unavailability component of the confrontation clause in *Ohio v. Roberts*, supra:

(I)n conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

448 U.S. at 65, 100 S.Ct. at 2538. A witness may be deemed "unavailable" only if the prosecution has made "a *good faith effort* to obtain his presence at trial." *Id.* at 74, 100 S.Ct. at 2543 (emphasis in original) (quoting *Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). And, under the foregoing language in *Ohio v. Roberts,* it is *the prosecution* that must produce or demonstrate the unavailability of a declarant. The Court did not impose any burden on the *accused* to show that the declarant is available. *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (right to confrontation guaranteed in state courts under the Fourteenth Amendment Due Process Clause).

The classic case of "unavailability" arises where the co-conspirator is awaiting his own trial on the same or related charges or, where already convicted, the co-conspirator is facing sentencing or appeal. In the instant case, Wells was acquitted of all charges before appellant came to trial. Wells had no remaining privilege to claim. Because there is nothing in the record to indicate that the Commonwealth ever established that Wells could refuse to testify against appellant, the Commonwealth failed to carry its burden of demonstrating the declarant's legal unavailability.

In a footnote, the *Roberts* Court suggested that "(a) demonstration of unavailability, however, is not always required," *id.,* 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. To support this proposition, the Court cited *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), in which it had permitted the admission of coconspirator hearsay in circumstances where a seemingly available declarant was not called to testify. The *Roberts* Court described *Dutton*

as a case where the requirement of unavailability could be dispensed with because "the utility of trial confrontation" would have been "remote." *See* 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Here, Wells' statements do not fall within the *Dutton* exception to the unavailability requirement because they are crucial to conviction, and not "of peripheral significance at most," as in *Dutton*, 400 U.S. at 87, 91 S.Ct. at 219. Appellant's conviction cannot rest on unexplored hearsay.

The instant case is also distinguishable from *Dutton* because the Commonwealth has not carried its burden of showing that the hearsay was "marked with such trustworthiness," *Ohio v. Roberts*, 448 U.S. at 65, 100 S.Ct. at 2539, to justify disregarding the unavailability requirement. Here, the relayers of Wells' statements were Wells' companions, convicted and awaiting sentencing.

The opportunity to cross-examine an accuser or a critical witness is a powerful tool in the search for truth and in the assessment of guilt or innocence. The confrontation clause, in the words of the Supreme Court contemplates:

a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Ohio v. Roberts*, 448 U.S. at 63–64, 100 S.Ct. at 2538. Because the right of confrontation is so important to our adversarial system, it may only be denied in exceptional situations. The Commonwealth has not met its burden to show the existence of such a situation.

Admission of Wells' statements without affording appellant the opportunity to cross-examine the declarant sharply tipped the scales against the accused. For that reason, we remand this case for a new trial.

■ We address so many of the remaining issues as are relevant in light of our decision today. Appellant argues that his Fourth Amendment guarantee against unlawful search and seizure was violated, resulting in the seizure of the murder weapon and inducement of appellant's inculpatory statement. We hold that there was no violation of appellant's Fourth Amendment rights and rule that the weapon and statement were properly admitted into evidence.

The suppression court made extensive findings of fact. Having satisfied ourselves that the record supports those findings, we adopt the facts found by the suppression court:

1. The defendant is charged with felony murder, robbery, and conspiracy to commit robbery arising out of the murder/robbery which occurred at Porreca's Bar on January 9, 1982.

2. On January 26, 1982, the Sharon Police, through informants had four names including that of the defendant and one Alfred Boatwright, as being involved in the planning and execution of the robbery and murder. The police then believed that the gun used in the murder was a gun that belonged to the defendant's mother and that the defendant had driven the getaway car.

3. On January 27, 1982, the defendant resided at his mother's home at 1037 Hamilton Avenue, Farrell, Pennsylvania. The house was rented by Mrs. Pinkins as lessee and she and the defendant occupied the house as well as the defendant's sister and brother.

4. On January 27, 1982, the defendant was on parole from a prior conviction of burglary. On that date the Sharon Police contacted the defendant's parole officer. They asked him to arrange it so that the defendant would be out of his mother's home that morning in order that they could talk to the defendant's mother without hindrance about her gun and to avoid the defendant removing, hiding, or destroying the evidence which might be at the mother's home.

5. Pursuant thereto, the parole officer went to the Pinkins' home and told the defendant a mostly false story which required the defendant's presence at the police station. But for the request of the police department, the parole officer would not have seen or requested Pinkins to leave the house with him that morning.

6. Upon arrival at the mother's house the police informed the mother that her son was suspected of being a participant in the robbery/murder at Porrecca's Bar and that the murder gun was her gun.

7. Mrs. Pinkins became upset and denied that she had seen the gun for over one year. She did admit to having a gun registered in her name and she produced a box of shells for that gun from her bedroom.

8. Mrs. Pinkins gave the police express permission to search her entire house without exception, but the police declined stating she knew her house better than they did. Prior to giving consent to search to the police, she informed them that it was her house, that she was incontrol over the house, and that she was responsible for the house. She further stated that the others lived there in the house under her guidelines and that she was the head of the house. The permission she gave the police to search the house was without exception and she did not state nor indicate that they were not permitted to enter the defendant's bedroom, or that they might be unable to get access into that bedroom or that it might be locked, or that there was in fact anywhere in the house they could not go.

9. Although the police declined the search, they asked Mrs. Pinkins if she would search the house and if she did find the gun to let the police know. The police stressed the importance of finding the gun, that it was in her son's best interest to find the gun, and was urged to make a very extensive search ("needle by needle"). Once the gun was found, she was told the police could begin to unravel what had occurred, and it would be important to her son

if they could place him somewhere other than behind the trigger.

10. The finding of the gun would also be of importance to Mrs. Pinkins in that she had been informed that it was her gun that had been used, she had produced a box of shells from her bedroom, and the necessary implication was that if she produced the murder gun, it would help exculp her from any belief that she, too, was involved.

11. At the time the police went to talk with Mrs. Pinkins, they did not have a search warrant nor did they have enough information to be able to obtain a valid search warrant for Mrs. Pinkins' home.

12. When Mrs. Pinkins agreed to search the house, she at no time stated or indicated to the police that she did not have the right to enter her son's room for the search, or that she did not have access thereto, or that it might be locked. She in fact indicated to the contrary, and upon the police leaving she immediately and readily went to her son's room with her daughter and other son, searched it and quickly obtained the gun. Mrs. Pinkins made no attempt to try to get the defendant's consent to search the room or wait until her return or indicated any necessity therefor.

13. Within ten minutes after the police left the Pinkins' house, they received a call from Mrs. Pinkins stating that she had found the gun. When they returned she produced a .32 caliber chrome two-inch barrel Clerk revolver. This gun was the weapon used to kill the deceased, Orland Porrecca.

14. The gun was found by Mrs. Pinkins in a jacket pocket in the closet in the defendant's bedroom. The defendant normally kept the gun in his jacket pocket or on the floor of the closet.

15. The registered owner of the murder gun was the defendant's mother, Mrs. Pinkins. On at least one prior occasion during the preceding year, she had asked the defendant about the gun because she wanted it. He did not give it to her.

16. Upon receipt of the gun the police interviewed the defendant at the Farrell Police Department. After properly giving the defendant his *Miranda* Rights, which he waived, the defendant was interrogated. The defendant at first continually denied any involvement, but upon being shown the gun, he gave a statement inculpating himself as an accomplice in the murder/robbery. The production of the gun was the cause of the defendant giving the inculpating statement.

17. After the defendant's statement and on that same date, a co-defendant, Alfred Boatwright, was interviewed. He had previously denied any complicity in the crime. During this interview Boatwright was informed that Pinkins had confessed implicating him, and Boatwright gave a complete statement inculpating himself and other including the defendant, Pinkins. Prior to confessing Boatwright stated that he was full or remorse and concern, stating that he wished to clear his conscience and "get it off his chest." This at least in part motivated his confession.

18. Boatwright's statement by itself would have provided a proper basis for a search warrant of the Pinkins' house. It implicated Pinkins and identified him as the source of the murder gun. The police would have used this statement to obtain a search warrant, and in fact searched the Pinkins' house for the gun had they not already had it in their possession.

19. On January 27, 1982, the defendant was laid off from work but paid money or its equivalent as rent to his mother.

20. The defendant occupied a separate bedroom on the second floor of his mother's house. He had a key to the bedroom door and he occasionally locked the door.

21. On January 27, 1982, the door to the defendant's bedroom was unlocked and partially open when his mother came to wake him to advise him his parole officer was there. The defendant did not lock the door to the bedroom when he left with his parole officer, nor did the

mother find the room locked when she went to search for the gun.

22. The defendant's room was cleaned occasionally by his sister who he paid to do that, but he did not insist on being present whenever she cleaned.

23. The defendant's clothes were washed by his mother and she could go into his bedroom to get his clothes.

24. The defendant's sister who lived at the mother's house did not pay rent, and if the defendant did not or could not pay rent, he would not be thrown out or asked to leave. The payment of rent was not a condition of his occupancy of his bedroom.

25. After the mother had found the gun in his room, the defendant never objected nor asked why she had gone into the bedroom without obtaining her permission.

26. While the defendant had a key to the bedroom which he occasionally used, there was also another key which would open the door to his bedroom. This was kept in the back door of the house. The defendant's key and the key in the back door were "skeleton" keys that opened several doors throughout the house including the back porch door.

27. While the other would generally knock before entering the defendant's room, it was not required that she do so by the defendant.

28. The defendant never told his mother not to go into his room without his consent and he never told his mother that he did not want her in his room.

29. There were inconsistencies between the testimony of the mother and the defendant. On several issues their testimony was less than candid.

30. The mother, Mrs. Pinkins, rents the house at 1037 Hamilton Avenue, Farrell, Pennsylvania, under the Section 8 Scattered Site Housing Program.

■ We begin our analysis by noting that the Fourth Amendment applies only to governmental agents and not to private citizens. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Where, as here, Mrs.

Pinkins may have conducted the search at the urging of the police, we will regard her as an instrument of the government to whom Fourth Amendment proscriptions apply. *Commonwealth v. Borecky,* 277 Pa.Super. 244, 419 A.2d 753 (1980).

Our determination that Fourth Amendment considerations apply leads us to examine whether appellant had a reasonable expectation of privacy concerning his closet and the gun. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Commonwealth v. Sell,* 288 Pa.Super. 371, 432 A.2d 206 (1981). Reasonableness is measured in the context of the totality of the circumstances. *Commonwealth v. Latshaw,* 481 Pa. 298, 392 A.2d 1301 (1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979).

Under the circumstances of this case we find that *Commonwealth v. Lowery,* 305 Pa.Super. 66, 451 A.2d 245 (1982) (Popovich, J., joining) is directly on point. In *Lowery,* the police approached the mother of the nineteen year old defendant and requested permission to search the defendant's bedroom. The search yielded an amount of LSD. This Court upheld the search, finding that the defendant did not have a reasonable expectation of privacy in the invaded place. *Id.,* 305 Pa.Superior Ct. at 72, 451 A.2d at 248. The defendant failed to demonstrate an overt indication of privacy in his family household. *Id.,* 305 Pa.Superior Ct. at 70, 451 A.2d at 247, *citing Commonwealth v. Reiland,* 241 Pa.Super. 109, 359 A.2d 811 (1976). The court found no protected landlord-tenant relationship despite the defendant's monthly one hundred dollar rental payment. 305 Pa.Super. at 72, 451 A.2d at 248. Instead, the court viewed as dispositive the fact that the defendant's mother regularly entered his room on a variety of household tasks. The defendant did not protest when family members entered his room. Further, there was testimony that the defendant never locked his door. The court concluded that the defendant's mother possessed a common authority over the prem-

ises with concomitant right to permit a government search. *Id.*, 305 Pa.Superior Ct. at 72, 451 A.2d at 248, *citing United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

The case *sub judice* presents a virtually identical fact situation. Appellant was lured away from the house by his parole officer. Police then approached Mrs. Pinkins and informed her that appellant was a suspect in the robbery/murder and that the murder weapon was her gun. Mrs. Pinkins gave the police express permission, which they declined, to search her house. She told the police that she was in control of the house and that the household lived under her guidelines. The police asked Mrs. Pinkins to search for the gun and to notify the police if she found the gun. After the police departed, Mrs. Pinkins located the gun in appellant's bedroom closet, which had a closed door blocked by a couch, and notified the authorities. Upon receipt of the gun, the police interviewed appellant, who properly waived his *Miranda* rights and gave an inculpatory statement.

We hold that the weapon was properly seized and that the gun and the statement were properly admitted into evidence. As in *Lowery,* appellant had no reasonable expectation of privacy, notwithstanding his payment of *three hundred dollars per month rent.* Appellant's mother and sister on occasion entered his room to clean and remove laundry. Appellant never forbade family members' entering his bedroom. We find unpersuasive evidence that a couch barred access to the closet door. In light of the totality of the circumstances, furniture arrangement, without more, is not an overt indication of an expectation of privacy.

Appellant, relying on *Lowery,* argues that the police subjected Mrs. Pinkins to excessive duress and coercion, and that the search was not voluntary. Reviewing the testimony, we cannot say Mrs. Pinkins' will was overborne. Finally, we agree with the court below that principles of property law should be considered in evaluating an individu-

al's expectation of privacy. *See Commonwealth v. Lowery,* 305 Pa.Super. at 70, 451 A.2d at 247. Mrs. Pinkins, as registered owner of the gun, had the right to search for the gun which she had given to her son to hold for her. *Cf. Leitch v. Sanford Motor Truck Company,* 279 Pa. 160, 123 A. 658 (1924) (in a bailment at will the owner of possession may follow his property wherever found and reclaim it). Mrs. Pinkins properly recovered her gun; thus the gun and resulting statement were admissible into evidence.

▮▮▮▮▮ Appellant next argues that the prior acquittal of Tony Wells severs any connection appellant might have had with the murder/robbery conspiracy. The gist of appellant's argument is that his involvement was limited to complicity with Tony Wells. In effect, appellant and Wells formed a two person conspiracy tangential to the multi-person conspiracy. It is true that prior acquittal of an accused's sole co-conspirator will preclude conviction of the accused. *Commonwealth v. Campbell,* 257 Pa.Super. 160, 390 A.2d 761 (1978), affirmed, 484 Pa. 387, 399 A.2d 130 (1979), questioned in *Commonwealth v. Byrd,* 490 Pa. 544, 417 A.2d 173 (1980). Wells' acquittal does not, however, put the Commonwealth out of court. The Commonwealth, to establish liability, must prove that appellant conspired with the other members of the group, *viz.,* Boatwright, Grannison, Phillips and Bruce.

Because Wells' statements formed the linchpin of Commonwealth's case, the lower court erred in failing to instruct the jury that Wells had been acquitted of all charges in the episode. The court, instructing the jury, did explain that the testimony of Boatwright and Bruce was subject to close scrutiny as the product of a "corrupt source." On retrial, the court should apprise the jurors of Wells' status to enable them to weigh his statements properly. Whether this is to be accomplished by special interrogatories or a simple instruction, we leave to the trial court's discretion.

Judgment of sentence is vacated and case remanded for a new trial.

ROWLEY, J., files a dissenting statement.

ROWLEY, Judge, dissenting:

I respectfully dissent.

I agree with the majority that there is sufficient independent evidence to permit a reasonable inference of the appellant's participation in the conspiracy so that the testimony of Bruce and Boatwright concerning the statements of Wells was properly admitted as an exception to the Hearsay Rule. *See Commonwealth v. Sullivan,* 472 Pa. 129, 159–160, 371 A.2d 468, 482–483 (1977).

However, I do not agree that appellant's Sixth Amendment right of confrontation was violated by the admission of the testimony. The trial court relied on the decision in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), in holding that the testimony concerning the statements by Wells was admissible. Before us, reliance is placed on the decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), to reach a contrary result. In my opinion, however, *Ohio v. Roberts* is distinguishable and not controlling.

In *Ohio v. Roberts,* the issue was whether or not a *transcript* of the testimony of a preliminary hearing witness could be used by the Government in rebuttal. The Court there emphasized that before the transcript could be utilized it was necessary to establish the unavailability of the witness. In this case, as in *Dutton v. Evans,* we are dealing, not with the admissibility of a transcript, but with the testimony of two live witnesses who appellant confronted and cross-examined. Moreover, the need to establish the reliability of the evidence is met in this case by, among other things, the appellant's own statement which corroborates the statements attributed to Mr. Wells. As in *Dutton,* then, the issue in this case "does not involve evidence in any sense crucial or devastating." *Id.,* 400 U.S. at 87, 91 S.Ct. at 219. Therefore, I would affirm the judgment of sentence on the trial court's well-reasoned opinion.