J-A01031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE E. CESPEDE | : | |
| | : | |
| Appellant | : | No. 3178 EDA 2016 |

Appeal from the Judgment of Sentence August 30, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004559-2015

BEFORE: OTT, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:             **FILED MAY 14, 2019**

Jose E. Cespede appeals from the judgment of sentence entered following his jury-trial convictions for possession with intent to deliver a controlled substance ("PWID") and conspiracy to commit PWID. Cespede challenges the trial court's denial of his motion to suppress and the sufficiency of the evidence to support the convictions. We affirm.

Cespede was arrested in March 2015 in connection with the manufacture and distribution of heroin.

The trial court set forth the following factual history:

> Multiple credible witnesses testified and direct and circumstantial physical evidence [was] introduced that amply demonstrated that . . . Cespede, had been actively involved as a remorseless high level heroin manufacturer and trafficker. The sworn testimony introduced from various Federal Special Agents, state and county police officers assigned to Homeland Security Investigations, referred to as "H.[S.I.]," established that a three year investigation,

coordinated by investigative agencies, had begun in May 2012, focusing on the heroin packaging and transportation "mills" and organizations operating predominantly by persons born in the Dominican Republic in Philadelphia area. This collective investigative intelligence had been largely based upon surveillances of drug trafficking behaviors combined with reliable confidential, multi-sourced information. This concerted investigation led to the related arrests of multiple persons including [Cespede] on at least one earlier occasion and the previous confiscation of at least 492 grams of heroin.

On March 3, 2015, two reliable confidential sources led these same investigators to surveil a dark-skinned male, nicknamed "Papi," later identified as Simeon Gonzalez, a native of the Dominican Republic. Papi had reportedly been operating numerous heroin packing "mills" at specified residences (specifically 5440 Rutland Street and 5144 Whitaker Avenue [("Whitaker House")] in Philadelphia) with other males from the Dominican Republic, and using a brown Honda Accord PA registration HHW-5453 to transport the narcotics. On that date, H.[S.I.] Special Agents and others set up observation posts and videotaped the surveillance of Papi in the surrounding Cheltenham and Rutland Streets in Philadelphia.

At approximately 10:57 a.m., agents observed Papi exit the 5440 Rutland Street house and enter the targeted brown Honda Accord. Papi was followed to the corner of Whitaker and Smylie Streets where he parked the Accord and entered [the Whitaker House]. After Papi's entry into the real property, agents observed a red Honda Sedan stop in front of [the Whitaker House]. They saw a second Hispanic male, identified initially as "HM#2," check the mailbox in front of the property at [the Whitaker House] and walk inside through the same door previously used by Papi and others. Shortly thereafter, HM#2 exited the property and conducted his own counter-surveillance for law enforcement. After HM#2 stared at the positioned surveillance units, he walked quickly toward Harkness Street and appeared to text on his cell phone while checking parked vehicles on the block. He then crossed the street on foot before returning to enter

[the Whitaker House]. Agents realized that HM#2 detected law enforcement.[1]

Shortly after conducting his counter-surveillance measures, HM#2 exited [the Whitaker House] carrying at least one large sporty duffel bag, a baseball bat and glove. He walked with these items to the front of a gold Chrysler minivan which had been parked at 5156 Melbus Street (located to the rear of [the Whitaker House]) and walked away empty-handed down an alley. During the attempt to view the activities of HM#2, agents noticed that Papi's Honda Accord had also left the area. Agents summoned a certified and markedly reliable K-9 drug sniffing dog "Spike" and his handler, Police Officer John Callahan[,] to conduct an exterior sniff of the minivan. Spike immediately signaled the presence of the illegal narcotic substances within the van.

As surveillance units were attempting to process the minivan, the brown Honda Accord that was previously seen being driven and parked by Papi, returned to the area and literally interrupted police in the middle of the street. This vehicle was stopped to prevent flight in the middle of the street just outside of [the Whitaker House]. Papi, who later identified himself as Simeon Gonzalez from the Dominican Republic with a residence in New York, was the driver. Two additional occupants of the brown Honda were Dalton Morinta-Abreu who was identified by agents as HM#2, who had been viewed earlier carrying the subject duffle bags and conducting counter-surveillance after exiting [the Whitaker House], and [Cespede] as a rear-passenger who identified himself as Jose Cespede.

Special Agent Edward Troy, one of the investigators at the scene, recognized the rear passenger in the brown Honda Accord as [Cespede] who previously identified himself as Jose Ernesto Cespede-Gonzalez, a registered Legal Permanent Resident from the Dominican Republic living in Wildwood New Jersey, from a preceding arrest involving the heroin mill operation at 7409 Oxford Avenue in Philadelphia on February 27, 2[01]4. This Agent also recalled that

---

[1] The agents testified that they suspected that their surveillance was detected, but did not know whether the individuals suspected law enforcement or a rival drug gang. N.T., 4/28/16, at 19, 50.

[Cespede] had been seen during the prior surveillance two years earlier operating the same Chrysler Minivan that was now holding the processed heroin filled duffle bags.

The registered owner to the brown Honda Accord was none of the occupants. The three occupants, including [Cespede] as rear passenger, were temporarily detained pending the obtaining of search warrants and further investigation. A valid consent to search the brown Honda Accord was duly obtained from the driver Papi. A pat down of the three individuals in the Honda Accord was conducted for the safety of the officers.

The keys to the front door of [the Whitaker House] were retrieved from Dalton Morinta-Abreu's person. A single Chrysler key with fob was found on [Cespede's] person. Subsequent to the consent to search, agents located and retrieved three cell phones in the front are[a] of the Accord, various paperwork for the brown Honda's repairs and the sweat shirt that Mr. Abreu had been wearing earlier. A State of New Jersey Driver's License with [Cespede's] photograph and listing the Wildwood, New Jersey residence was produced by [Cespede] as identification along with $1000.00 United States Currency.

In the back seat, next to where [Cespede] had been seated, an Under Armour back pack was retrieved and later found to contain the following items: medical paperwork reflecting liposuction costing $30,000.00 for Jose Cespede as the patient; a Dominican Republic election card with [Cespede's] photograph in the name of Jose Ernesto Cespede Gonzalez; a PECO bill in the name of Jose Cespede listing the same Oxford Avenue Philadelphia address where Cespede had been arrested in connection with heroin distribution in 2014; the American Insurance Company receipt for the targeted 2006 Chrysler Minivan placed in the name for the registered owner Korey Devaughn; flight tags and receipts in the name of Jose Cespede with Jet Blue Airways; a child support Order issued to Jose Cespede by the Superior Court of New Jersey with hearing notice; TD Bank receipts for Jose Cespede; a key ring and a piece of cardboard with handwriting listing names and varied dollar amounts up to $39,0000.00 per person similar to the drug ledgers writing samples found in the apartment at [the Whitaker House].

The key fob that had been removed from [Cespede's] person, caused the targeted gold Chrysler minivan lights to turn on and off upon application. This Chrysler key fob was later used to click open the minivan after the Search Warrant for the Chrysler minivan had been obtained.

Inside the backpack positioned next to where [Cespede] had been seated in the brown Honda Accord was paperwork reflecting the American Insurance Company receipt for the targeted 2006 Chrysler Minivan placed in the name for the registered owner Korey Devaughn.

Separate from the automobile stop, immediately after Spike, the reliable working detection dog, had reacted to the minivan other agents obtained Search and Seizure Warrants Numbers 179642 and 179643. Special Agent Richard Gramlich was the affiant and the Honorable Bradley Moss as duly elected Judge of the Municipal Court for the First Judicial District of Pennsylvania signed and authorized the searches on March 3, 2015[,] authorizing the search, after review and approval of the probable cause section of each warrant. The warranted search was executed upon the targeted Gold Chrysler Minivan and the real property located at [the Whitaker House]. Following execution, the two sporty duffle bags that had been previously observed as transported and deposited by HM#2, identified as Honda Accord passenger Dalton Morinta-Abreu, were confiscated from the subject minivan. Also confiscated from the minivan were rental receipts in the name of Mark Escobar and bills for the same listed apartment as the receipt in the name of [Cespede] as Jose Cespede Gonzalez.

The large sporty duffle bags retrieved from the minivan contained in excess of 1250 grams of cut heroin in various forms, along with numerous heroin coated items including: Scotch whiskey containers, glassine packets; straws; coffee grinders; platinum tins; ink pads and stamps; metal sifters; freezer bags and assorted containers commonly used by drug traffickers to package, weigh, sort, stamp, cook and cut and distribute heroin. Inside the apartment located at [the Whitaker House], numerous boxes of similar narcotics processing items were retrieved along with itemized hand written ledgers matching the ledgers found in the back pack containing [Cespede's] documents. Additionally, eleven cellular telephones, a Garmin GPS device, bags of

respiratory masks, additional sporty duffle bags, Samsung tablet, miscellaneous documents, a metal PA License Plate, and $4,200.00 were found and confiscated. Because the atmosphere inside the apartment was so toxic, the air born substances had been bagged together after protective gear was provided to law enforcement. No evidence of any normal residential living quarters was located within the real property [at the Whitaker House].

All of the physical evidence was collected, field tested, inventoried and assigned to at least twenty four Property Receipts and subsequently formally examined by the Police Chemical Lab and processed. At trial, expert testimony was introduced concerning the common methods and instruments used by heroin processing mills and distributors and the estimated overall street value of the bulk heroin confiscated in this case was over $412,520,000.00.

Trial Court Opinion, filed June 6, 2018, at 5-10 ("1925(a) Op.").

The affidavit of probable cause in support of the application for a search warrant for the minivan stated that an investigation of a heroin mill organization started on or about May 2012, and that the information from this investigation caused the officers to identify and target a male known as "Papi" in 2015. It detailed the surveillance set forth above, including the actions of the individuals under surveillance, the canine sniff, the stop of the Honda Accord, and that a key fob found on Cespede activated the minivan.

Cespede filed a motion to suppress the physical evidence, challenging the car stop, pat-down search, retrieval of the car key and use of the key fob, and the search warrants.[2] After a hearing on the motion to suppress, the trial court denied the motion.

_____

[2] Although the certified record does not contain the motion to suppress, the hearing on the motion detailed the arguments.

The case proceeded to a jury trial. The jury found Cespede guilty of PWID and conspiracy, but acquitted him of use or possession of drug paraphernalia. On August 30, 2016, the trial court sentenced Cespede to an aggregate term of ten to 30 years' incarceration.

Cespede filed a post-sentence motion, which the trial court denied. Cespede filed a timely notice of appeal.

Cespede raises the following issues:

> I. Whether the stop and frisk of [Cespede] violated Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the Constitution of the United States where the uncontradicted evidence indicates no individualized, objective basis for the agent to conclude that [Cespede] was armed and dangerous and whether the evidence derived from the illegal stop and frisk must be suppressed as fruit of the poisonous tree?

> II. Whether the evidence was sufficient to prove that [Cespede] actually or constructively possessed with intent to deliver more than 1000 grams of heroin or conspired with unidentified persons to do so as charged in counts one and two of the Information?

> III. Whether the evidence was insufficient to prove that [Cespede] conspired with unidentified persons to possess with intent to deliver heroin as charged in count two?

Cespede's Br. at 3-4.

## I.    The Court Did Not Err in Denying Motion to Suppress.

In his first issue, Cespede challenges the denial of his motion to suppress. He argues that the police officers lacked an individualized, objective basis to believe he was armed and dangerous and that an individual's location, standing alone, does not provide sufficient grounds for a protective search.

Cespede claims that "discovery of the key fob was direct fruit of the unlawful stop and frisk" and that "[p]ressing the key fob was another" constitutional violation "since it violated what the Commonwealth alleged was [Cespede's] possessory interest in the gold minivan and his right to privacy." Cespede's Br. at 21. He further claims the "heroin found in the gold minivan is fruit of the poisonous tree to the extent the Commonwealth linked the heroin to [Cespede] through the unlawful searches and seizures leading to discovery of the key to the vehicle on [Cespede's] person." *Id.*

Our standard of review on appeal of the denial of a motion to suppress is limited to determining "whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Griffin*, 24 A.3d 1037, 1041 (Pa.Super. 2011) (quoting *Commonwealth v. Lohr*, 715 A.2d 459, 461 (Pa.Super. 1998)). If the record supports the factual findings of the trial court, we reverse "only if there is an error in the legal conclusions drawn from those factual findings." *Id.* (citation omitted).

"[T]he [F]ourth [A]mendment to the United States Constitution as well as Article I, § 8 of the Pennsylvania Constitution protect citizens from 'unreasonable searches and seizures.'" *Commonwealth v. Simmons*, 17 A.3d 399, 402-03 (Pa.Super. 2011) (quoting *Commonwealth v. Baer*, 654 A.2d 1058, 1059 (Pa.Super. 1994)). A warrantless search or seizure is unreasonable "unless conducted pursuant to specifically established and well-delineated exceptions to the warrant requirement." *Id.* at 403 (quoting *Katz*

*v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "One such exception, the **Terry**[3] 'stop and frisk,' permits a police officer to briefly detain a citizen for investigatory purposes if the officer 'observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot.'" **Id.** (quoting **Commonwealth v. Fitzpatrick**, 666 A.2d 323, 325 (Pa.Super. 1995)). Further, "'[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others' the officer may conduct a pat down search 'to determine whether the person is in fact carrying a weapon.'" **Id.** (quoting **Terry**, 392 U.S. at 24).

Search warrants "may only issue upon probable cause and '[t]he issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.'" **Commonwealth v. Leed**, 186 A.3d 405, 413 (Pa. 2018) (quoting Pa.R.Crim.P. 203(B)). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." **Id.** (quoting **Commonwealth v. Johnson**, 42 A.3d 1017, 1031 (Pa. 2012)). Further, "[t]he affidavit of probable cause 'must provide the magistrate with a substantial basis for determining the existence

---

[3] **Terry v. Ohio**, 392 U.S. 1, 24 (1968).

of probable cause[.]'" ***Id.*** (quoting ***Illinois v. Gates***, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). In addition, where a search warrant is based on inaccurate information, we have held that "courts may uphold a warrant if an independent basis exists to support a finding of probable cause; however, . . . a court must invalidate a search warrant if the sole basis for finding probable cause is the material misstatements." ***Commonwealth v. Antoszyk***, 985 A.2d 975, 982 (Pa.Super. 2009) (emphasis omitted).

### A. Reasonable Suspicion

Following the suppression hearing, the trial court found the officers had reasonable suspicion to stop the vehicle and to conduct a pat-down search for the officer's protection. N.T., 4/28/16, at 90.

We agree. Based on surveillance of the driver of the Honda Accord and of a house associated with the car and minivan, and the results of a canine sniff of the minivan, the police officers reasonably suspected the minivan to contain narcotics. While waiting the approval of a search warrant for the minivan, the Honda Accord returned. Based on their prior experience, the officers were concerned that the car's occupants either knew the police officers were surveilling them or believed the police officers were a rival drug gang. This provided reasonable suspicion that the car's occupants, including Cespede, were armed and dangerous and justified the protective search.

Cespede relies, in part, on ***Commonwealth v. Grahame***, 7 A.3d 810 (Pa. 2010), and ***Ybarra v. Illinois***, 444 U.S. 85 (1979), for the proposition that the officers lacked individualized suspicion to search him. In ***Grahame***,

the Pennsylvania Supreme Court found the police officers lacked reasonable suspicion to search the defendant's handbag solely based on her presence in the residence of another individual who sold illegal drugs outside the defendant's presence. 7 A.3d at 817. There, the officer "conducted a protective search of [the defendant's] purse based on a generalization that firearms are commonly found in close proximity to illegal drugs." *Id.* In *Ybarra*, police officers were executing a search warrant of a tavern based on probable cause that "Greg" was selling narcotics from the tavern. 444 U.S. at 88. The officers conducted a "cursory search for weapons" of all individual located in the tavern, including the defendant, who was a tavern patron. *Id.* The United States Supreme Court found the search of the defendant was unconstitutional, noting the police did not recognize the defendant and had no reason to believe he had committed or was committing any offense, the defendant made no movements to suggest he was concealing contraband, and he said nothing of a suspicious nature to the officer. *Id.* at 91. The court noted that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.*

Here, unlike in *Grahame* and *Ybarra*, the protective search was not based merely on presence or on a generalization that firearms follow drugs. Rather, the officers were investigating a drug mill involving multiple individuals in the car and believed that the individuals detected their

- 11 -

surveillance, and either knew of the officers' presence or believed the officers to be a rival drug gang.[4]

**B. Key Fob**

Cespede also challenges the officer's use of the fob, claiming the use "violated Article I, Section 8 and the Fourth Amendment since it violated what the Commonwealth alleged was [Cespede's] possessory interest in the gold minivan and his right to privacy." Cespede's Br. at 21.[5]

We conclude that we need not reach this issue, as sufficient probable cause supported the search warrants, and the driver of the Honda Accord consented to the search of the Honda.

Where a search warrant is based on inaccurate information, "courts may uphold a warrant if an independent basis exists to support a finding of probable cause." *Antoszyk*, 985 A.2d at 982. In *Commonwealth v. Harvard*, we concluded that the use of a key fob found at a robbery scene did

---

[4] The police officers testified that they conducted the pat-down search of Cespede before Special Agent Troy recognized Cespede as someone who had driven the minivan in the past and had previously been arrested in connection with the investigation. N.T., 4/28/16, at 23, 30. Because the frisk occurred before Special Agent Troy saw Cespede and the agents do not claim this recognition was a basis for the search, *id.* at 49, we also do not rely on it as a basis to support the protective search.

[5] Cespede does not argue on appeal that the officer violated his rights when the officer retrieved the key from his person. He argues the police officer lacked reasonable suspicion to conduct a protective search and violated his rights when the officer used the key fob.

not constitute a search, but, even if it did constitute a search,[6] the "use of the key fob was immaterial to [the officer's] ability to obtain the warrant" for the residence. 64 A.3d 690, 695-96 (Pa.Super. 2013). We noted the officer had identified the defendant from surveillance videos and his driver's license photo, the defendant became a suspect by using a robbery victim's ATM card, and the officer confirmed Harvard's "connection to the vehicle through . . . observations of [the defendant] using the vehicle." *Id.* at 696. The key fob "provided additional evidence linking [the defendant] to the home invasion, but it was superfluous for purposes of obtaining the warrant." *Id.*

Here, we conclude that, even if the retrieval of the key and use of the fob constituted violations, no evidence would have been suppressed. The search of the Honda Accord was based on consent of the driver and the searches of the minivan and Whitaker House were based on warrants supported by probable cause.

The trial court found:

> [It] reasonably determined that the admission of all physical evidence confiscated from the targeted brown Honda Accord and its occupants, the Chrysler Minivan and its contents, and the real property located at [the Whitaker House], was completely reasonable. The receipt of credible confidential

---

[6] In *Harvard*, this Court found use of a key fob did not constitute a search requiring a search warrant. 64 A.3d at 695-96. There, police recovered a key fob from the location of a robbery, and used that fob to activate a vehicle suspected to be used by the perpetrator of the robbery. *Id.* at 695. This Court found use of the key fob did not constitute a search, noting the officer did not use the fob to gain entry to any concealed portion of the car. *Id.* at 696. Rather, the "key fob simply enabled [the officer] to make additional plain view observations from his lawful vantage point." *Id.*

> information combined with the analysis of the reported ongoing observed activities of all arrested persons within this case presented ample probable cause to justify the execution of Search and Seizure Warrants upon the associated Chrysler minivan and real property located at [the Whitaker House]. A valid consent to search the Accord had been duly provided by the driver, "Papi." Although not necessary for this Court's determination, exigent circumstances also existed that validated the stop of the Accord in the street outside of the real property at [the Whitaker House] to prevent harm through flight or destruction of evidence.

1925(a) at 13. We agree. The evidence obtained was not found as a result of the stop, frisk, or use of the fob. Rather, the evidence was obtained following the execution of the search warrants supported by probable cause. Although the warrant for the minivan mentioned the key fob found on Cespede and that the fob activated the minivan, this information was superfluous and not a material portion of the warrant and, if the use of the key fob was removed from the warrants, the warrants would still be supported by probable cause. *Harvard*, 64 A.3d at 696; *Antoszyk*, 985 A.2d at 982.

### II. The Commonwealth Presented Sufficient Evidence to Support the Convictions.

Cespede next argues the Commonwealth failed to present sufficient evidence to support the PWID and conspiracy convictions.

When reviewing a sufficiency of the evidence claim, we must determine whether, when viewed in the light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crime charged is established beyond a reasonable doubt. *See Commonwealth v. Brown*, 23 A.3d 544,

559 (Pa.Super. 2011) (*en banc*). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Id.** (quoting **Commonwealth v. Hutchinson**, 947 A.2d 800, 805-06 (Pa.Super. 2008)).

Cespede first claims the Commonwealth failed to present sufficient evidence of PWID. He claims the Commonwealth failed to establish he possessed any narcotics and failed to establish he knew narcotics were in the minivan. He notes that the officers saw another individual carrying the bag to the minivan and the minivan was registered to a third individual.

Cespede next argues the Commonwealth failed to present sufficient evidence of a conspiracy. He claims the Commonwealth did not establish he knew he was involved in a conspiracy, as there was no evidence he knew there was heroin in the minivan and no evidence he was inside the Whitaker House. He claims the evidence merely shows he was out of the country for a couple months and asked friends to pay his bills, and that 13 months prior to his arrest he drove the minivan. He claims this merely establishes association, not conspiracy.

The trial court set forth the elements of the crimes and the relevant law and found the Commonwealth presented sufficient evidence to support the convictions for PWID and conspiracy. 1925(a) Op. at 13-18. It reasoned that the surveillance, the items found in the bag in the Honda Accord, the evidence found in the minivan, and the items and paperwork found in the Whitaker House supported the convictions. We agree with the trial court that the

evidence was sufficient. After review of the parties' briefs, the certified record, and the well-reasoned opinion of the Honorable Anne Marie B. Coyle, we affirm on the basis of the trial court opinion. 1925(a) Op. at 6-7.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/14/19

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA ) PHILADELPHIA COUNTY
) COURT OF COMMON PLEAS

CP-51-CR-0004559-2015 Comm. v. Cespede, Jose E.
Opinion

VS.


8119214981

NO. CP-51-CR-0004559-2015

JOSE E. CESPEDE

**FILED**

'JUN-0 6 2018

Appeals/Post Trial
Office of Judicial Records

OPINION

Appellant, Jose Cespede, as the above-named Defendant, seeks review of the Order and Judgments of Sentence, entered on August 30, 2016 in the above-captioned matter, by this Court, the Honorable Anne Marie B. Coyle, Judge of the First Judicial District, Court of Common Pleas. The Appellant asserts various errors within his Statement of Matters Complained of on Appeal Pursuant to Pa. R. P. 1925(b) filed on August 16, 2017. Appellant's claims were reasserted and rephrased within the Supplemental Statement of Matters Complained of on Appeal Pursuant to Pa. R. P. 1925(b) filed on March 19, 2018 by Appellant's subsequently retained appellate counsel Cheryl J. Strum, Esquire following the Motion For Leave to File the Supplemental Statement of Matters Complained Of On Appeal *Nunc Pro Tunc.*

PROCEDURAL HISTORY

The underlying case, which is the subject matter of the instant appeal, stems from the arrest of Jose E. Cespede on March 4, 2015 for his active participation with at least three other men, also from the Dominican Republic, in the illegal manufacture and distribution of heroin valued on the street in excess of $4,000,000.00 inside and near 5144 Whitaker Avenue, Philadelphia, PA. Following his arrest, Appellant was charged with the felony offenses of Manufacture, Delivery or

1

Possession With Intent to Manufacture or Deliver Controlled Substance, 35 §78-113 §§A30, Conspiracy- Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, 18 P.S. §903, and the misdemeanor offenses of Knowing and Intentional Possession of Controlled Substance By Person Not Registered, 35 P.S. §78-113 §§A16, and Use or Possession of Drug Paraphernalia, 35 P. S. §78-113 §§A32.

After extensive defense pre-trial delay, on April 28, 2016, a hearing was conducted before this Court concerning a pre-trial Motion To Suppress Physical Evidence filed on behalf of the Defendant by his trial counsel Guy Sciolla, Esquire. This Court denied Defendant's Motion To Suppress on May 9, 2016.

On May 10, 2016, this Court conducted an evidentiary hearing concerning the Defendant's Motion *in Limine* seeking to exclude relevant evidence from a previous surveillance that the Defendant had been seen two years earlier driving the subject Chrysler minivan, from which the duffle bags of packaged heroin were retrieved in the instant matter. This Court denied Defendant's Motion *in Limine* to exclude this relevant nexus data.

Following jury selection, the Commonwealth's case began on May 10, 2016 and ended May 11, 2016 with this Court as the presiding jurist. The defense Motion For Directed Verdict was raised and denied on May 11, 2016. The defense began its introduction of evidence on May 11, 2016 and completed the defense case on May 12, 2016.

On May 12, 2016, closing arguments and jury instructions were given before the jury retired to begin deliberations. Following this Court's response to jury questions, the jury returned verdicts of guilty on May 13, 2016 to the felony offenses of Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, 35 P.S. §780-113 §§A30, Conspiracy- Manufacture, Delivery or Possession With Intent to Manufacture or Deliver

2

Controlled Substance, 18 P.S.§903. The jury found the Defendant not guilty of the misdemeanor offense of Use or Possession of Drug Paraphernalia, 35 P.S. §780-113 §§A32

Immediately following entry of verdicts, Presentence Investigative Reports and Mental Health Assessments were ordered and a sentencing hearing date was set for July 14, 2016. This Court granted the defense request for a continuance of the sentencing hearing. On August 30, 2016, following thorough review of the Presentence Investigative Reports, the sentencing guideline calculations promulgated by the Pennsylvania Commission of Sentencing and upon hearing testimonial evidence and oral argument, this Court sentenced Defendant to serve an aggregate term of state supervised confinement of 10 years to 30 years with permitted calculated credit for time served and applied rehabilitative conditions, followed by 5 years of state supervised probation.

Specifically, the Order of Sentence directed the imposition of standard guideline sentences for each count as follows:

Count 1: Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, 35 P.S. §780-113 §§A30: State supervised confinement for minimum period of 5 years to maximum period of 15 years;

Count 2: 1 Conspiracy- Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, 18 P.S. §903: State supervised confinement for minimum period of 5 years to maximum period of 15 years running consecutively to the period of confinement imposed in Count 1.

The Order of Sentence reflected that credit for custodial time served was to be applied and that the Defendant was not statutorily deemed eligible for RRRI or Boot Camp early release programs. In addition, the Order of Sentence reflected the imposition of payment of a $50,000.00 fine and rehabilitative requirements of educational or vocational training. The Defendant was directed to use his best efforts to seek and maintain legitimate employment when paroled and to

3

submit to random testing for illegal drugs or alcohol and to home and vehicle checks for drugs or weapons.

A timely Motion for Reconsideration of Sentence was filed on behalf of the Defendant by his trial counsel on September 8, 2016. On September 21, 2016, Defendant's trial counsel filed a corresponding Writ of *Habeas Corpus*. This Court entered an Order denying Post-Sentence Motions after a hearing on September 26, 2016.

The Defendant's Notice of Appeal to the Superior Court was filed by subsequently retained appellate counsel Lawrence Anthony Narcisi, III. This Court issued an Order Pursuant to PA.R.P. 1925(b) on October 21, 2016, again on November 7, 2016, and again on August 3, 2017. The Defendant's Statement of Matters Complained on Appeal was filed on August 16, 2017.

In his Statement of Matters Complained of on Appeal Pursuant to Pa. R. P. 1925(b), Defendant argues as follows:

1. "The trial court erred by denying the motion to suppress;
2. The trial court erred in granting the motion *in limine* allowing testimony to be introduced regarding Appellant operating the gold minivan 33 months prior to arrest;
3. The trial court erred in denying trial counsel the opportunity to cross exam regarding the disposition of the co-defendant's case;
4. The verdict was inconsistent and against the evidence to the extent that Appellant was found not guilty of possessing paraphernalia which was located in the same duffle bag as the narcotics; and.
5. The aggregate sentence of 10 to 30 years state incarceration was unreasonable and an abuse of discretion."

On March 19, 2018, Appellant, by and through subsequently hired counsel, Chery J. Sturm, Esquire, filed a Motion For Leave to File Supplemental Statement of Matters Complained of on Appeal *Nunc Pro Tunc* and the attached as "Exhibit "D." corresponding Supplemental Statement of Matters Complained of on Appeal citing the need to supplement the previously filed "vague" Statement of Matters Complained of on Appeal.

4

The Supplemental Statement essentially repeated the previous claims, *i.e*; that the trial court erred by denying the suppression motion originally litigated. The Supplemental Statement also reiterated the argument that the verdicts had not been supported by sufficient evidence. The Supplemental Statement also argues that the imposed sentence violated the double jeopardy clause of the Fifth Amendment made applicable to the States through the Due Process Clause of the Fourteenth Amendment because the imposed sentences for the felony offenses of Conspiracy and Possession With Intent To Distribute Controlled Substance should have merged despite the salient difference in statutory offense elements.

This Court entered an Order on March 23, 2108 granting the Appellant's Motion For Leave to file Supplemental Statement of Matters Complained of on Appeal *nunc pro tunc* and permitted the docketing of the Supplemental Statement as of record.

## FACTUAL HISTORY

Multiple credible witnesses testified and direct and circumstantial physical evidence had been introduced that amply demonstrated that the Defendant, Jose E. Cespede, had been actively involved as a remorseless high level heroin manufacturer and trafficker. The sworn testimony introduced from various Federal Special Agents, state and county police officers assigned to Homeland Security Investigations, referred to as "H.I.S.," established that a three year investigation, coordinated by investigative agencies, had begun in May 2012, focusing on the heroin packaging and transportation "mills" and organizations operating predominantly by persons born in the Dominican Republic in Philadelphia area. This collective investigative intelligence had been largely based upon surveillances of drug trafficking behaviors combined with reliable confidential, multi-sourced information. This concerted investigation led to the related arrests of

5

multiple persons including Appellant on at least one earlier occasion and the previous confiscation of at least 492 grams of heroin.

On March 3, 2015, two reliable confidential sources led these same investigators to surveil a dark-skinned male, nicknamed "Papi," later identified as Simeon Gonzalez, a native of the Dominican Republic. Papi had reportedly been operating numerous heroin packing "mills" at specified residences (specifically 5440 Rutland Street and 5144 Whitaker Avenue in Philadelphia) with other males from the Dominican Republic, and using a brown Honda Accord PA registration HHW-5453 to transport the narcotics. On that date, H.I.S. Special Agents and others set up observation posts and videotaped the surveillance of Papi in the surrounding Cheltenham and Rutland Streets in Philadelphia.

At approximately 10:57 a.m., agents observed Papi exit the 5440 Rutland Street house and enter the targeted brown Honda Accord. Papi was followed to the corner of Whitaker and Smylie Streets where he parked the Accord and entered a row home located at 5144 Whitaker Street. After Papi's entry into the real property, agents observed a red Honda sedan stop in front of 5144 Whitaker Avenue. They saw a second Hispanic male, identified initially as "HM#2," check the mailbox in front of the property at 5144 Whitaker Avenue and walk inside through the same door previously used by Papi and others. Shortly thereafter, HM#2 exited the property and conducted his own counter-surveillance for law enforcement. After HM#2 stared at the positioned surveillance units, he walked quickly toward Harkness Street and appeared to text on his cell phone while checking parked vehicles on the block. He then crossed the street on foot before returning to enter 5144 Whitaker Avenue. Agents realized that HM#2 detected law enforcement.

Shortly after conducting his counter-surveillance measures, HM#2 exited 5144 Whitaker Avenue carrying at least one large sporty duffel bag, a baseball bat and glove. He walked with

6

these items to the front of a gold Chrysler minivan which had been parked at 5156 Melbus Street (located to the rear of 5144 Whitaker Avenue) and walked away empty-handed down an alley. During the attempt to view the activities of HM#2, agents noticed that Papi's Honda Accord had also left the area. Agents summoned a certified and markedly reliable K-9 drug sniffing dog "Spike" and his handler, Police Officer John Callahan to conduct an exterior sniff of the minivan. Spike immediately signaled the presence of the illegal narcotic substances within the van.

As surveillance units were attempting to process the minivan, the brown Honda Accord that was previously seen being driven and parked by Papi, returned to the area and literally interrupted police in the middle of the street. This vehicle was stopped to prevent flight in the middle of the street just outside of 5144 Whitaker Street. Papi, who later identified himself as Simeon Gonzalez from the Dominican Republic with a residence in New York, was the driver. Two additional occupants of the brown Honda were Dalton Morinta-Abreu who was identified by agents as HM#2, who had been viewed earlier carrying the subject duffle bags and conducting counter-surveillance after exiting 5144 Whitaker Avenue, and Appellant as a rear passenger who identified himself as Jose Cespede.

Special Agent Edward Troy, one of the investigators at the scene, recognized the rear passenger in the brown Honda Accord as Appellant who previously identified himself as Jose Ernesto Cespede-Gonzalez, a registered Legal Permanent Resident from the Dominican Republic living in Wildwood New Jersey, from a preceding arrest involving the heroin mill operation at 7409 Oxford Avenue in Philadelphia on February 27, 2104. This Agent also recalled that Appellant had been seen during the prior surveillance two years earlier operating the same Chrysler Minivan that was now holding the processed heroin filled duffle bags.

7

The registered owner to the brown Honda Accord was none of the occupants. The three occupants, including the Defendant as rear passenger, were temporarily detained pending the obtaining of search warrants and further investigation. A valid consent to search the brown Honda Accord was duly obtained from the driver Papi. A pat down of the three individuals in the Honda Accord was conducted for the safety of the officers.

The keys to the front door of 5144 Whitaker Avenue were retrieved from Dalton Morinta-Abreu's person. A single Chrysler key with fob was found on Appellant's person. Subsequent to the consent to search, agents located and retrieved three cell phones in the front are of the Accord, various paperwork for the brown Honda's repairs and the sweat shirt that Mr. Abreu had been wearing earlier. A State of New Jersey Driver's License with the Defendant's photograph and listing the Wildwood, New Jersey residence was produced by the Defendant as identification along with $1000.00 United States Currency.

In the back seat, next to where Appellant had been seated, an Under Armour back pack was retrieved and later found to contain the following items: medical paperwork reflecting liposuction costing $30,000.00 for Jose Cesepede as the patient; a Dominican Republic election card with Appellant's photograph in the name of Jose Ernesto Cespede Gonzalez; a PECO bill in the name of Jose Cespede listing the same Oxford Avenue Philadelphia address where Cespede had been arrested in connection with heroin distribution in 2014; the American Insurance Company receipt for the targeted 2006 Chrysler Minivan placed in the name for the registered owner Korey Devaughn; flight tags and receipts in the name of Jose Cespede with Jet Blue Airways; a child support Order issued to Jose Cespede by the Superior Court of New Jersey with hearing notice; TD Bank receipts for Jose Cespede; a key ring and a piece of cardboard with

8

handwriting listing names and varied dollar amounts up to $39,0000.00 per person similar to the drug ledgers writing samples found in the apartment at 5144 Whitaker Avenue.

The key fob that had been removed from the Defendant's person, caused the targeted gold Chrysler minivan lights to turn on and off upon application. This Chrysler key fob was later used to click open the minivan after the Search Warrant for the Chrysler minivan had been obtained. Inside the backpack positioned next to where the defendant had been seated in the brown Honda Accord was paperwork reflecting the American Insurance Company receipt for the targeted 2006 Chrysler Minivan placed in the name for the registered owner Korey Devaughn.

Separate from the automobile stop, immediately after Spike, the reliable working detection dog, had reacted to the minivan other agents obtained Search and Seizure Warrants Numbers 179642 and 179643. Special Agent Richard Gramlich was the affiant and the Honorable Bradley Moss as duly elected Judge of the Municipal Court for the First Judicial District of Pennsylvania signed and authorized the searches on March 3, 2015 authorizing the search, after review and approval of the probable cause section of each warrant. The warranted search was executed upon the targeted Gold Chrysler Minivan and the real property located at 5144 Whitaker Avenue, Philadelphia. Following execution, the two sporty duffle bags that had been previously observed as transported and deposited by HM#2, identified as Honda Accord passenger Dalton Morinta-Abreu, were confiscated from the subject minivan. Also confiscated from the minivan were rental receipts in the name of Mark Escobar and bills for the same listed apartment as the receipt in the name of Defendant as Jose Cespede Gonzalez.

The large sporty duffle bags retrieved from the minivan contained in excess of 1250 grams of cut heroin in various forms, along with numerous heroin coated items including: Scotch whiskey containers, glassine packets; straws; coffee grinders; platinum tins; ink pads and stamps; metal

9

sifters; freezer bags and assorted containers commonly used by drug traffickers to package, weigh, sort, stamp, cook and cut and distribute heroin. Inside the apartment located at 5144 Whitaker Avenue, numerous boxes of similar narcotics processing items were retrieved along with itemized hand written ledgers matching the ledgers found in the back pack containing the Defendant's documents. Additionally, eleven cellular telephones, a Garmin GPS device, bags of respiratory masks, additional sporty duffle bags, Samsung tablet, miscellaneous documents, a metal PA License Plate, and $4,200.00 were found and confiscated. Because the atmosphere inside the apartment was so toxic, the air born substances had been bagged together after protective gear was provided to law enforcement. No evidence of any normal residential living quarters was located within the real property 5144 Whitaker Avenue.

All of the physical evidence was collected, field tested, inventoried and assigned to at least twenty four Property Receipts and subsequently formally examined by the Police Chemical Lab and processed. At trial, expert testimony was introduced concerning the common methods and instruments used by heroin processing mills and distributors and the estimated overall street value of the bulk heroin confiscated in this case was over $412,520,000.00.

## DISCUSSION

I.    **Appellant's pre-trial Motion to Suppress Physical Evidence was properly denied.**

Within his Supplemental and original Statement of Matters Complained of on Appeal, Appellant asserted that this Court erred by admitting the physical evidence at trial after denying the pre-trial Motion to Suppress all confiscated physical evidence filed on behalf of the Defendant by his trial counsel.

10

The appellate court's standard of review of a denial of a motion to suppress is to determine whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. *Commonwealth v. Moye*, 836 A.2d 973 (Pa. Super. 2003) quoting *Commonwealth v. McClease*, 750 A.2d 320, 323 (Pa. Super. 2000). The scope of review is limited; the appellate court may consider "only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Id.* quoting *Commonwealth v. Maxon*, 798 A.2d 761, 765 (Pa. Super. 2002). Where the record supports the findings of the suppression court, the appellate court is bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. *Moye, supra.*, quoting *McClease*, 750 A.2d at 323-24 quoting *In the Interest of D.M.*, 560 Pa. 166, 743 A.2d 422, 424 (1999).

The Fourth Amendment of the United States Constitution provides that government officers shall not violate the right of the people to be secure from unreasonable searches and seizures in their persons and effects. U.S. Const. Amend. IV. A person is "seized" within the meaning of the Fourth Amendment if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (holding that no seizure occurred when defendant ran upon seeing police car and officers accelerated to drive alongside him). Factors indicating the occurrence of a seizure of the person include the threatening presence of several police officers, display of a weapon, physical contact, and use of language or a tone of voice indicating that government officers might compel the person's compliance with a request. 1 Robert L. Evangelista, *Pennsylvania Criminal Trial Guide* § 7.60 (2002) (compiling state and federal cases).

11

Additionally, the Fourth Amendment does not prohibit warrantless searches, but rather unreasonable searches. The reasonableness of a search depends upon the facts and circumstances of the particular case, considered in the context of established constitutional principles. *Commonwealth v. Cihylik*, 337 Pa. Super. 221, 486 A.2d 987 (Pa. Super. Ct. 1985) citing *United States v. Samuels*, 374 F.Supp. 684, 685 (E.D.Pa. 1974). In Pennsylvania, "the burden is upon the Commonwealth to prove by a preponderance of the evidence that a search or seizure did not violate the fourth amendment." *Cihylik*, citing *Commonwealth v. Silo*, 480 Pa. 15, 21, 389 A.2d 62, 65 (1978). It is now well-recognized that, in order to challenge successfully a warrantless search, the challenger must have a legitimate expectation of privacy in the area or property searched. *See Katz v. United States*, 389 U.S. 347, 351-52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

This privacy test is twofold: "the expectation must not only be 'actual (subjective),' but also one that 'society is prepared to recognize as reasonable.'" *Commonwealth v. Cihylik*, quoting *Commonwealth v. Lowery*, 305 Pa. Super. 66, 71, 451 A.2d 245, 247 (1982), quoting *Katz v. United States, supra.* 389 U.S. at 361, 88 S.Ct. at 516 (HARLAN, J., concurring). In *Commonwealth v. Sell*, 288 Pa. Super. 371, 432 A.2d 206 (1981), the court stated: The controlling consideration, therefore, is whether the individual contesting the search and seizure entertains a legitimate expectation of privacy in the premises or area searched. A legitimate expectation of privacy by definition means more than a subjective expectation of not being discovered.

When reviewing the denial of a motion to suppress, a reviewing court must determine: (1) whether the record supports the suppression court's factual findings; and (2) whether the suppression court drew appropriate inferences and legal conclusions from those findings. *Commonwealth v. Davis*, 979 A.2d 357, 360 (Pa. Super. Ct. 2009) (internal citation omitted).

12

When the record supports the suppression court's factual findings, the reviewing court is bound by those facts and may reverse only if the suppression court formulated its legal conclusions in error. *Id.*

In the instant matter, this Court properly conducted an evidentiary hearing and reasonably determined that the admission of all physical evidence confiscated from the targeted brown Honda Accord and its occupants, the Chrysler Minivan and its contents, and the real property located at 5144 Whitaker Avenue, Philadelphia, PA was completely reasonable. The receipt of credible confidential information combined with the analysis of the reported ongoing observed activities of all arrested persons within this case presented ample probable cause to justify the execution of Search and Seizure Warrants upon the associated Chrysler minivan and real property located at 5144 Whitaker Avenue in Philadelphia. A valid consent to search the Accord had been duly provided by the driver, "Papi." Although not necessary for this Court's determination, exigent circumstances also existed that validated the stop of the Accord in the street outside of the real property at 5144 Whitaker Avenue to prevent harm through flight or destruction of evidence.

## II. Evidence sufficiently supported the jury verdicts of guilt.

Appellant claimed in his Supplemental and original Statement of Matters Complained of on Appeal, that the entry of the jury verdicts of guilty to the felony offenses of Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, 35 P.S. §78-113 §§A30, and Conspiracy- Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, 18 P.S. §903 were not supported by sufficient evidence. In reviewing the sufficiency of evidence, an appellate court considers "whether the evidence

13

presented at trial was sufficient to establish all elements of the crime beyond a reasonable doubt." Commonwealth v. Burton, 2 A.3d 598 (Pa. Super. Ct. 2010).

The appellate court views all of the evidence and reasonable inferences there from in a light most favorable to the Commonwealth as verdict winner. *Id.* Where there is sufficient evidence to enable the finder of fact to determine every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. *Id.* The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Commonwealth v. Feliciano,* 2013 Pa. Super 117, 67 A.3d 19 quoting *Commonwealth v. Stokes,* 2011 Pa. Super 261, 38 A.3d 846, 853-854 (Pa. Super. 2011) (internal citations and quotations omitted). For purposes of appellate review under these principles, the entire record is reviewed and all evidence is considered. *Commonwealth v. Trinidad,* 96 A.3d 1031, 1038 (Pa. Super. 2014) (quoting *Commonwealth v. Emler,* 903 A.2d 1273, 1276-1277 (Pa. Super. 2006)).

Simply stated, in order to sustain a guilty verdict for the offense of *Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance,* pursuant to 35 P.S. §780-113 §§A30, there must have been proof presented beyond a reasonable doubt that Appellant had participated in some manner in the manufacture, delivery, or possession with intent to manufacture, or deliver controlled substance as enumerated within the Controlled Substance, Drug, Device, and Cosmetic Act.

As to all applicable elemental sections of this offense, it is undisputed that heroin is one of the enumerated controlled substances under Schedule I as enumerated within the Controlled Substance, Drug, Device, and Cosmetic Act. For a person to be convicted of *"Manufacturing"* heroin it must be proven beyond a reasonable doubt that the individual intentionally, knowingly,

14

or recklessly manufactured heroin. The term *"Manufacture"* is defined as the "production, preparation, propagation, compounding, conversion or processing of a controlled substance, other drug or device or the packaging or repackaging of such substance or article, or the labeling or relabeling of the commercial container of such substance or article, but does not include the activities of a practitioner who, as an incident to his administration or dispensing such substance or article in the course of his professional practice, prepares, compounds, packages or labels" 35 P.S. §780-102(b). Basically, the term manufacture incorporates to any active participation in the creation of heroin as the controlled substance at issue.

To be held responsible for the *"Delivery"* of the controlled substance is must be proven that the individual delivered the controlled substance. The term *"Deliver"* includes the actual, constructive, attempted transfer of one person to another of a controlled substance. It is well accepted that a delivery may take place between two persons even though one of them is acting as an agent for the other. 35 P.S. §780-102(b).

The alternate offense element of *"Possession With Intent To Deliver"* refers to two essential elements, possession combined with the demonstrated purpose to transfer the controlled substance to at least one other person. As with all statutory elements, possession and the requisite intent can be proven with direct or circumstantial evidence. For an individual to possess the controlled substance, the individual must have the intent to control and the power to control the controlled substance. Naturally, the individual must be aware of the items presence and nature. Two or more persons may have joint possession of a controlled substance as long as each individual shares the necessary intent to control the narcotics. In addition, an individual may be found guilty of possession of an item he does not hold if it is proven that the defendant was part of a conspiracy

15

and another conspirator knowingly possessed the drugs and that possession occurred while the conspiracy was in existence and was in furtherance of the goals of the conspiracy.

Before the separate charge of *Conspiracy-Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance*, pursuant to 18 P.S. §903 can be sustained, proof beyond a reasonable doubt must be introduced that the Defendant agreed and acted in concert with at least one other person to deal, manufacture, distribute, deliver or possess with intent to deliver enumerated controlled substances such as heroin. This agreement may be unspoken and may also be proven with a form of combined direct and circumstantial evidence presented. Additionally, one of the members of a conspiracy must actually do some overt act to facilitate the goal of the conspiracy.

The cumulative evidence introduced at the instant trial proved beyond a reasonable doubt that Appellant had been interrupted from actively participating as a middle to high management level heroin trafficker and from resuming his manufacturing and distribution efforts by law enforcement. Before Appellant had entered the viewpoint of surveillance officers on the date of his arrest in this case, his co-conspirators had been detected by law enforcement, utilizing the same brown Honda Accord that was later confiscated and hastily and temporarily transporting and storing over 1290 grams of processed heroin, along with all of the tools of the trade of heroin, from the distribution and processing mill inside 5144 Whitaker Avenue to a Chrysler minivan parked in a nearby alley to avoid law enforcement detection. Appellant had been relevantly linked as a driver of the same Chrysler minivan that held the bulk of confiscated heroin in this case two years earlier during a surveillance of heroin distribution conducted by the same law enforcement officials.

16

Appellant's individual and collective constructive possession of all of the confiscated narcotics from inside the minivan and the real property located inside 5144 Whitaker Avenue was abundantly established by connective threads of evidence. The Defendant's complicity was introduced when he was observed in the back seat of the earlier spotted Honda Accord along with the originally targeted subject Papi, also known as Simeon Gonzalez, as the driver, and HM#2, also known as Dalton Morinta-Abreu, as the front passenger upon their return to presumably pick up the million dollar valued heroin and distribution or processing apparatuses from the Chrysler minivan parked in the back alley.

The contents of the Under Armour back pack that had been removed from where the Defendant had been singularly seated as a rear passenger in the stopped specifically linked Appellant to both the heroin production mill at 5144 Whitaker Avenue and the Chrysler minivan with its contraband cargo. This back pack contained Appellant's identifying information including a Dominican Republic election card with the Defendant's photograph in the name of Jose Ernesto Cespede Gonzalez; the medical paperwork reflecting liposuction costing in excess of $30,000.00 in the patient name of Jose Cesepede with the Wildwood residential address; and a PECO bill in the name of Jose Cespede listing the same Oxford Avenue Philadelphia address where Cespede had been arrested in connection with earlier heroin distribution ring in 2014 was also recovered. This previous surveillance included the observation of Appellant's operation of the subject Chrysler minivan confiscated in this case.

Appellant's back pack also contained an American Insurance Company receipt for the targeted 2006 Chrysler Minivan placed in the name for the registered owner Korey Devaughn; flight tags and receipts in the name of Jose Cespede with Jet Blue Airways for flights to and from the Dominican Republic; a child support Order issued to Jose Cespede by the Superior Court of

17

New Jersey with hearing notice; TD Bank receipts for Jose Cespede; and a key ring. Within the same back pack, pieces of cardboard with handwriting listing names and varied dollar amounts up to $39,0000.00 per person were recovered that looked remarkably similar to the drug ledgers writing samples retrieved from the apartment at 5144 Whitaker Avenue following the warranted and authorized search and seizure of that property. Also found inside the Chrysler minivan were rental receipts in the name of Mark Escobar and bills listed for the same apartment as the receipt in Appellant's name of Jose Cespede Gonzalez.

The key fob that had been removed from Appellant's person was particularly probative of the Appellant's complicity and intent to distribute heroin. This key fob opened the Chrysler minivan vehicle that contained the sports bags of extremely expensive contraband that had been hurriedly carried and deposited for safe-keeping by his co-conspirator and fellow Honda occupant, Dalton Malton-Abrue immediately following Abrue's counter-surveillance measures and exit from the apartment at 5144 Whitaker Avenue. No other key was found on any other person or place following this arrest and seizure. It was a fair inference that this key was in Appellant's possession because he had claim to the minivan's contents when he and his co-conspirators had returned to retrieve their product. All direct and circumstantial evidence introduced at trial unequivocally demonstrated Appellant's individual and co-conspiratorial role in the heroin manufacturing and distribution business.

## III. The Order of Sentence was reasonable.

Appellant has vaguely challenged the discretionary aspects of the Order of Sentence within both of the Supplemental and the original Statement of Matters Complained of on Appeal filed on his behalf. The original Statement generally claimed that the "aggregate sentence of 10 to 30 years

18

state incarceration was unreasonable and an abuse of discretion." The Supplemental Statement additionally alleged that the sentence was illegal because the two individual crimes for which Appellant had been convicted merged for sentencing purposes. The claims failed to assert a substantial question justifying appellate review. Further, there is no merit presented to warrant any relief.

To invoke the appellate jurisdiction, appellant must have: (1) preserved the issue either by raising it at the time of sentencing or in a post-sentence motion; (2) filed a timely notice of appeal; (3) set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) raised a substantial question for our review. *Commonwealth v. Dunphy*, 20 A.3d 1215, 1220 (Pa. Super. 2011) (citation and footnotes omitted). Only if the appeal satisfies each of these four requirements, will the substantive merits of the claim be reviewed. *Commonwealth v. Antidormi*, 84 A.3d at 759.

Absent such efforts, an objection to a discretionary aspect of a sentence is waived." *Commonwealth v. McAfee*, 849 A.2d 270, 275 (Pa. Super. 2004) (citations and internal quotations marks omitted). Appellate review of the sentence imposed begins with the statutory prescription contained within 42 Pa. C.S.A. § 9781(b), which directs that an appeal may be granted at the discretion of the appellate court only where it appears that there is a substantial question that the sentence imposed is not appropriate under this chapter.

Appellant does not have a valid claim of excessive sentence without including an additional and more specific violation of the sentencing code. Only when a sentencing claim sets forth the manner in which either a particular provision of the Sentencing Code or an underlying fundamental norm of the sentencing process was violated, does a claim of excessiveness present a substantial

19

question. *Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002). A blanket claim of excessiveness, with no further allegations, does not create a substantial question. *Id.*

Moreover, within this Commonwealth, the "imposition of a sentence is vested in the discretion of the sentencing court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996). This standard reflects that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990). It is soundly recognized that:

> "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by a reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision."

*Commonwealth v. Antidormi*, 84 A.3d 736, 760 (Pa. Super. 2014) (citation omitted). There is no automatic right to appeal from the discretionary aspects of sentencing. *Id.* at 759. See also *Commonwealth v. Cook*, 941 A.2d 7 (Pa. Super. 2007).

An allegation that the sentencing court failed to consider certain mitigating factors generally does not necessarily raise a substantial question. *Commonwealth v. McNabb*, 819 A.2d 54, 57 (Pa. Super. 2003). *Accord Commonwealth v. Wellor*, 731 A.2d 152, 155 (Pa. Super. 1999) (reiterating allegation that sentencing court "failed to consider" or "did not adequately consider" certain factors generally does not raise substantial question). *Compare Commonwealth v. Felmlee*, 828 A.2d 1105, 1107 (Pa. Super. 2003) (*en banc*) (stating substantial question is raised, however, where appellant alleges sentencing court imposed sentence in aggravated range without adequately considering mitigating circumstances).

20

Consistent with this standard of record review, the appellate court shall have regard for: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and ... (3) the findings upon which the sentence was based." 42 Pa. C.S.A. § 9781 (d) (1) and (3). This review is based upon the premise that when imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant." *Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa. Super. 2002), *appeal denied,* 582 Pa. 671, 868 A.2d 1198 (2005), *cert. denied,* 545 U.S. 1148, 125 S.Ct. 2984, 162 L.Ed.2d 902 (2005).

"In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Id.* Where the sentencing court had the benefit of a presentence investigation report ("PSI"), we can assume the sentencing court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 519 Pa. 88, 101-02, 546 A.2d 12, 18 (1988). *See also Commonwealth v. Tirado*, 870 A.2d 362, 368 (Pa. Super. 2005) (stating if sentencing court has benefit of PSI, law expects court was aware of relevant information regarding defendant's character and weighed those considerations along with any mitigating factors).

Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code. *See Commonwealth v. Cruz-Centeno*, [ ] 668 A.2d 536 ([Pa. Super.] 1995), *appeal denied,* 544 Pa. 653, 676 A.2d 1195 (1996) (stating combination of PSI and standard range sentence, absent more, cannot be considered excessive or unreasonable). Although Pennsylvania's system stands for individualized sentencing, the court is not required to impose the "minimum possible" confinement. *Walls, supra* at 570, 926 A.2d at 965.

21

Under 42 Pa.C.S.A. § 9721, the court has discretion to impose sentences for each convicted offense consecutively or concurrently and, ordinarily, a challenge to this exercise of discretion does not raise a substantial question. *Commonwealth v. Pass*, 914 A.2d 442, 446-47 (Pa.Super. 2006). The imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment. *Id.* (holding challenge to court's imposition of sentence of six (6) to twenty-three (23) months imprisonment and sentence of one (1) year probation running consecutive, did not present substantial question). *Compare Dodge II, supra* (holding imposition of consecutive sentences totaling 58 ½ to 124 years imprisonment for thirty-seven (37) counts of theft-related offenses presented a substantial question because total sentence was essentially life sentence for forty-two year-old defendant who committed non-violent offenses with limited financial impact).

To the extent Appellant's discretionary aspects argument focuses on the imposition of consecutive sentences, well-settled jurisprudence, *cited supra*, is that a sentencing court has discretion to impose consecutive sentences, 42 Pa.C.S.A. § 9721, and that the imposition of consecutive sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." *Lamonda*, 52 A.3d at 372. See also *Commonwealth v. Moury*, 992 A.2d 162, 171–72 (Pa. Super. 2010).

In his original Statement of Matters To Be Complained Of On Appeal, Appellant superficially claimed that the aggregate sentence of 10 to 30 years state incarceration was unreasonable and an abuse of discretion." Thus, Appellant failed to state a claim that raises a substantial claim warranting appellate review. His claim was vague and lacked sufficient

22

specificity beyond expression of general disagreement with the discretionary aspect of this Court's sentencing authority. The claim failed to recognize that the Order of Sentence reflected the imposition of a minimum period of five (5) years state supervised confinement to fifteen (15) years separately for each of the two criminal offenses for which Appellant had been found guilty by the jury running consecutively to each other.

Even if a substantial question was presented, the transcribed record of the sentencing hearings conducted on August 30, 2016, and following Appellant's Motion For Reconsideration of Sentence on September 26, 2016, directly dispelled each claim. At the first sentencing hearing on August 30, 2018, this Court incorporated and specifically referenced its analysis of all the sentence data and written memoranda and oral arguments proffered by all parties and including the Presentence Investigative Reports and Mental Health evaluations.

In addition, it was duly recorded that the guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing had been duly considered. There was no discrepancy in its review and this Court provided a proper basis in a statement of reasons for the imposed sentence. This Court identified on the record that all significant aspects of the Defendant's background, his criminal actions, his extensive prior record, his impact on the community and the recommended sentencing guideline calculations had formed the basis for the sentences imposed.

This trial court acknowledged that the guidelines promulgated by the Pennsylvania Commission of Sentencing classified the Offense Gravity Score for each offense as a "13" and the Defendant's computed Prior Record Score as a "0*", based upon his computed record score excluding the diversionary program that he had successfully completed following his previous arrest in the State of New Jersey for possession of heroin. At the outset, and on the record, both counsel agreed that the guideline sentence range recommended for each offense was for a state

23

term of confinement of sixty (60) months to seventy-eight (78) months with deviation of plus or minus twelve (12) months. (N.T., 08/30/2016, p.6). The imposed sixty (60) month minimum period of confinement was at the lowest end of the recommended standard range for each offense.

The language of section 9781(c) states, a sentencing court's determination must stand unless the sentence was unreasonable. 42 Pa. C.S.A. § 9781(c). A sentence is reasonable when it includes examination of the public protection, the crime's gravity, and the defendant's rehabilitative needs, as listed in section 42 of the Pennsylvania Code. 42 Pa. Cons. Stat. Ann. § 9721 (West); *Walls*, 926 A.2d at 964. Additionally when the sentencing court has reviewed a presentence report, it is presumed that the court has considered the information it contains. *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. Ct. 2004) *aff'd* 891 A.2d 1265 (Pa. 2006). Facts can be considered, pursuant to § 9721(b)'s sentencing requirements, even if the facts are subsumed within the guideline recommendation. *Commonwealth v. Sheller*, 961 A.2d 187, 192 (Pa. Super. Ct. 2008).

This Court succinctly outlined, on the record, its rational for the imposed fair and reasonable Order of Sentence. This Court explicitly and implicitly touched upon all of the relevant or required sentencing factors, particularly when public safety was stated as a concern. On August 30, 2016, this Court after hearing all arguments and testimony presented from both parties, stated as follows:

> "Mr. Cespede, I do find that the verdicts of guilty for Possession With the Intent to Deliver a controlled substance, that substance being identified for the jury as heroin, in large quantities, and conspiracy related to the same had sufficient evidence supporting teach verdict.
> I find that the appropriate offense gravity score for each charge is 13. I accept the fact that your prior record is a zero. I note your prior contact with the State of New Jersey, relative to the diversionary program that was granted to you.
> Now, as you counsel correctly pointed out sir, you are an individual before this Court. And that individual, I note that you, like many other folks, including my ancestors, came to this country, immigrated to this country, and was granted the

24

ability to remain in this country to this land of opportunity. You took that opportunity to make a profit from people's pain. That is beyond reprehensible in this Court's eyes. You are not a person who is addicted or even using narcotics as you pointed out in the presentence, which I have reviewed in detail.

You came to this country with skills. You had a prior architectural education. You come from a good family, according to you. You were raised by both parents until their separation. You described your childhood as a good one with great relationships with your family members. Your father was an entrepreneur, as you have been. You've not had a legitimate type of employment in quite some time as noted in our presentence report, however, indicated that you, as an entrepreneur, bought and sold cars and upgraded cars for profit. You sold drugs for the profit. You participated in the heroin distribution.

Heroin, is in this Court's mind one of the most insidious narcotics that destroys lives, family relationships and has a rippling effect throughout this community. You did this for profit. You didn't have to do this, and you did it anyway. Based on all the circumstances I heard during the trial I identify you sir as upper middle management of the heroin trade. Those are aggravating circumstances that I take into account. I take in to account the aggravating circumstances of the extremely large amount of narcotics to which you were brought your cohorts back to the location because they contained your profit. Greed is the source of your difficulty, sir.

You have had every opportunity to do otherwise. You chose this. When you were granted the ability to have the diversionary program for the 39 packets of heroin that should have been a stoplight for you. It was not, because here you are not very long thereafter. You did not accept responsibility for your actions. That is not—you don't have a penalty for taking a trial, but you do not have the mitigating circumstances that present themselves when folks accept responsibility for their actions.

I, note with some dismay, that the paperwork that was recovered in this incident reflected that indeed you spent you ill-gotten gains on items for your own personal upkeep shall we say. I also note the trips that must have cost you a fair bit to go back and forth to the Dominican Republic. I note the type of vehicles that were used in this incident as well as the type of vehicle that was used in your prior arrest. I incorporate into my finding my review of the guidelines, my review of the presentence and psychological reports indicating that you are someone who is intelligent and devoid of mental difficulties. I note that you reported that you do not use narcotics. I have nothing to indicate otherwise.

All right. I do consider you to be a danger to the community given your choices in life. As such, to the charge of possession with intent to deliver a controlled substance, the sentence of this

Court is that you serve five to fifteen years of state time incarceration.

To the charge of conspiracy, the sentence of the Court is that your serve five to fifteen state time incarceration to run consecutively to the possession with intent to deliver a controlled substance.

The fine imposed on the possession with intent to deliver is $50,000.00. Given the fact that this trade of which you were involved in, the distribution of

25

narcotics valued in excess of a million dollars, hopefully that won't be too difficult for you.

In addition, I impose the restitution amount as requested, $2,145.00, for the drug analysis reports to be completed. And I no other fines on the Conspiracy. All fines and costs are to be paid during the period of parole.

It is a condition of your parole, if you are granted the ability to remain in this country, that you are to have random drug and alcohol testing, random home visits. That you are to seek and maintain legitimate employment and pay your fines and cost..." (See N.T. 08/30/2016, Pages 36-41.)

Likewise, pursuant to 42 Pa. C.S.A. § 9781(d)(1) and (3), this Court was well within its discretionary right to impose the sentences consecutively. The sentencing court's exercise of discretion by imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal in our Commonwealth. *Commonwealth v. Marts*, 889 A.2d 608 (Pa. Super. 2005).

In the instant matter, individualized consecutive standard sentences upon the Defendant were imposed only after careful consideration of all relevant sentencing factors including the paramount need for protection of the public, the gravity of the offense, and the Defendant's poor prospect of rehabilitation. Thus, the Defendant has not raised any substantial question that the consecutive sentences imposed were inappropriate or contrary to a fundamental norm underlying the sentencing code.

Discretion in Weight of Factors

Additionally, the weight given by the Court to the individual relevant sentencing factors is not a substantial question because this is simply a disagreement about this Court's determination of facts and the weight of those factors. Again, the sentencing court is given broad discretion in formulating a sentence, with no automatic right of review available. *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. Ct. 2010). An appeal can only be granted if there is a

26

substantial question as to a violation of a specific sentencing code or a fundamental norm. 42 Pa. C.S.A. § 9781; *Mouzon*, 812 A.2d at 627.

Appellant's claim amounts only to his mere disagreement with the recorded findings of fact by this Court. The record demonstrates that this Court's took into consideration all relevant mitigating and aggravating factors from the evidence presented (N.T., 9/30/2016, pp. 42-44). Thus, Appellant has failed to present a substantial question.

### Appellate Review: Applying Standard of Abuse in Discretion

Even if the reviewing court finds a substantial question, the sentencing court's determination can only be overturned for an abuse of discretion. *Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). Such an abuse is not just a mere disagreement. *Id.* It must be "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." *Id.* This standard is embodied in the language of section 9781(c), which dictates that when sentencing outside the guidelines, a sentencing court's determination must stand unless the sentence was unreasonable. 42 Pa. C.S.A. § 9781(c).

This Court specifically evidenced its comprehensive understanding of the Appellant's difficulties through its imposition of the rehabilitative conditions within the Order of Sentence. These conditions were aimed to prevent future harm. Therefore, Appellant has failed to assert any colorable claim, as this Court appropriately exercised its discretion in sentencing the Appellant after considering the Appellant's circumstances and characteristics in incredible detail.

Within the Supplemental Statement only, Appellant raised a challenge to the legality of his sentence where he posits that the two offenses for which he was convicted merge for sentencing purposes. This claim fails because the statutory elements of the two crimes substantially differ.

27

"A claim that the trial court imposed an illegal sentence by failing to merge sentences is a question of law." *Commonwealth v. One*, 88 A.3d 983, 1020 (Pa. Super. 2014). Accordingly, the Court's standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Brougher*, 978 A.2d 373, 377 (Pa. Super. 2009).

Section 9765 provides in pertinent part: No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense. 42 Pa.C.S.A. § 9765. "Accordingly, merger is appropriate only when two distinct criteria are satisfied: (1) the crimes arise from a single criminal act; and (2) all of the statutory elements of one of the offenses are included within the statutory elements of the other." *Commonwealth v. Raven*, 97 A.3d 1244, 1249 (Pa. Super. 2014).

The felony offense of Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, 35 P.S. §780-113 §§A30 required proof that the perpetrator participated either singularly or as part of a conspiracy in the manufacturing, delivery or attempted delivery or possession with intent to deliver, manufacture or transfer of illegal narcotics. The separate charge of Conspiracy - Manufacture, Delivery or Possession With Intent to Manufacture or Deliver Controlled Substance, pursuant to 18 P.S. §903 required proof however that that the offender agreed and acted in concert with at least one other person to deal, manufacture, distribute, deliver or possess with intent to deliver enumerated controlled substances such as heroin. Additionally one of the members of a conspiracy must actually perform some overt act to facilitate the goal of the conspiracy.

28

While the crimes in the instant case arise from the criminal episodes occurring over the course of hours during a single day, the statutory elements of each offense are plainly different, as each crime requires proof of one element that the other did not. *See, e.g., Commonwealth v. Walls*, 950 A.2d 1028, 1030-32 (Pa. Super. 2008) (holding sentences for robbery at Section 3701(a)(1)(ii) and aggravate assault at Section 2702(a)(1) arising from same facts do not merge because each requires proof of an element which the other does not); *see also Commonwealth v. Payne*, 868 A.2d 1257, 1263 (Pa. Super. 2005) (Concluding crimes of aggravated assault and robbery "do not merge, for robbery requires proof of theft, which aggravated assault does not, and aggravated assault as a felony of the first degree requires proof of circumstances manifesting extreme indifference to the value of human life, which robbery does not.").

In the instant matter, trial evidence proved beyond a reasonable doubt that Appellant actively and singularly participated in the heroin manufacturing and distribution business. Evidence also convincingly demonstrated that Appellant acted in concert with at least two other persons in the commission of multiple overt acts designed to facilitate the overall goal of the conspiracy which was to manufacture, deliver or transfer heroin for profit. Dissimilar elements of each offense were independently and competently sustained. Hence this claim fails.

**IV.** **Appellant's previously observed operation of the confiscated Chrysler Minivan was admissible and the disposition of cases concerning co-conspirators was inadmissible.**

Appellant complained within the initial Statement of Errors that this court should not have permitted the admission of testimony that Appellant had been observed by law enforcement approximately two years earlier operating the same Chrysler minivan that had contained the

29

confiscated processed heroin and distribution tools on the date of arrest. This testimony was properly admitted because it provided a direct nexus establishing Appellant's intention to possess and control the same automobile that was utilized to hide and transport the illegal contraband at issue. Clearly this data was probative and not unduly prejudicial particularly since the resulting previous arrest of Appellant was not admitted.

Alternatively, Appellant complained within the initial Statement of Errors that this court should have permitted his trial counsel to cross-examine one of the arresting law enforcement officers concerning the subsequent disposition of the cases against Appellant's co-conspirators. This testimony was not permitted because it was not probative of Appellant's complicity and it was impermissibly seeking the introduction of hearsay evidence from the witness. The trial court rulings were sound exercises of discretion. Thus, each claim failed for lack of merit.

## CONCLUSION

In reviewing the entire record, this Court finds no harmful, prejudicial, or reversible error. Accordingly, the judgment of the trial court should be affirmed.

By the Court,

DATE: 6/6/2018

Anne Marie B. Coyle, J.

30